**UNITED STATE DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**CASE NO.**

JORGE PORTER;
LIBIA PUERTA;
ALEXANDER PUERTA,

                Plaintiffs,

    vs.

CHIQUITA BRANDS
INTERNATIONAL, INC.;
ROBERT W. OLSON; ROBERT F.
KISTINGER; WILLIAM A. TSACALIS;
CHARLES KEISER; STEVEN G.
WARSHAW; JOHN A. ORDMAN and
KEITH E. LINDNER,

                Defendants.

_____/

                             **COMPLAINT**

                    CASE NO.: _____

                       **Jury Trial Demanded**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

        Jorge Porter, Libia Puerta, and Alexander Puerta by their attorneys Strauss Troy Co.,

LPA, allege as follows:

**INTRODUCTION**

        1.      Plaintiffs bring this action for damages under the Antiterrorism Act, 18 U.S.C. §§

2333-38 (the "ATA") and the Torture Victim Protection Act, 28 U.S.C. § 1350 note (the

"TVPA")

        2.      For a period of more than seven years, from 1996 until 2004, Defendants Chiquita

Brands International, Inc. ("Chiquita"), Robert W. Olson, Robert F. Kistinger, William A.

Tscalis, Charles Keiser, Steven G. Warshaw, John A. Ordman and Keith E. Lindner (collectively, "Individual Defendants"), together with other officers, directors, executives, and employees of Chiquita, knowingly and intentionally made over one hundred payments totaling more than $1.7 million to the United Self-Defense Groups of Colombia (the Autodefensas Unidas de Colombia, or the "AUC"), an organization they knew to be a notorious and violent terrorist organization.  Chiquita's payments to the AUC were designed, reviewed and approved at Chiquita's corporate headquarters in Cincinnati, Ohio by the Individual Defendants and other high-ranking senior executives, officers, and directors of the corporation.  Chiquita and the Individual Defendants made the payments to the AUC with the purpose of assisting the AUC to bring about a "bloody pacification" of Colombia's banana-growing regions near Santa Marta and Urabá, Colombia so that Chiquita could expand and more profitably operate what was already its most profitable business sector.

3.      These payments made it possible for the AUC to finance a widespread and systematic campaign of massacres, extrajudicial killings, murders, torture, kidnappings, forced disappearances, forced displacements and other violent acts against civilians in the region of Colombia where Plaintiff Jorge Porter's brother Juan Carlos Puerta lived, worked and was kidnapped, held hostage, tortured, and murdered by the AUC and where Plaintiff Jorge Porter was, himself, kidnapped, held hostage, and tortured by the AUC.

4.      In September 2001, the United States government designated the AUC as a Foreign Terrorist Organization (an "FTO").  In October 2001, it designated the AUC as a Specifically-Designated Global Terrorist (a "SDGT").  It is a federal crime for any person or entity to provide material support or engage in unauthorized transactions with the AUC.  By making payments to the AUC for several years after that 2001 designation, Chiquita regularly,

2

repeatedly and knowingly engaged in criminal conduct that violated federal law and provided practical assistance and material support to a violent terrorist organization.

5.      Even before the United States government designated the AUC an FTO and SDGT, Chiquita and the Individual Defendants knew they were assisting and purposefully supporting a violent terrorist organization to carry out their "bloody pacification."

6.      In 2007, the United States Department of Justice ("DOJ") charged Chiquita with Engaging in Transactions with a Specially-Designated Global Terrorist in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. 594.204.  After being charged, Chiquita pled guilty to the offense, admitting that its payments to the AUC were unlawful.  In conformity with its plea agreement, Chiquita was convicted of a felony, agreed to a criminal fine of $25 million and was placed on corporate probation for a period of five years.

7.      Plaintiff Jorge Porter, an American citizen, was kidnapped, held hostage and tortured by the AUC as a result of Chiquita's and the Individual Defendants' knowing and purposeful support for the AUC and its operations.  Jorge, Libia, and Alexander are family members of Juan Carlos Puerta, a US veteran and Colombian citizen who was kidnapped, held hostage, tortured and killed by the AUC as a result of Chiquita's and the Individual Defendants' knowing and purposeful support for the AUC and its operations.

8.      Plaintiffs now seeks compensatory, punitive, and treble damages arising from Chiquita's violations of the ATA and the Individual Defendants' violations of the ATA and the TVPA.

## JURISDICTION AND VENUE

9.      This Court has federal question subject matter jurisdiction over this civil action pursuant to (i) 28 U.S.C. § 1331 because the action arises under the laws of the United States; (ii) 18 U.S.C. §§ 2333(a) and 2334 because the action is brought by United States citizens who have

been injured by acts of international terrorism; and (iii) 28 U.S.C. § 1350 note because Jorge

Porter is an American citizen who was subjected to torture by individuals and individuals acting

under the color of state law of a foreign country.

10.     This Court has personal jurisdiction over Chiquita and the Individual Defendants.

11.     Venue is proper and convenient in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

12.     Plaintiff Jorge Porter ("Jorge") is, and was at the time the Defendants committed

the crimes alleged in the Complaint, a United States citizen and resident of Florida.  He was

kidnapped, held hostage and tortured by the AUC as a result of Chiquita's and the Individual

Defendants' purposeful support for the AUC and its operations.  He is also the brother of

decedent Juan Carlos Puerta ("Juan Carlos"), a Colombian citizen and United States resident

alien who was kidnapped, held hostage, tortured, and murdered by the AUC as a result of

Chiquita's and the Individual Defendants' purposeful support for the AUC and its operations.

Jorge is a survivor and heir of Juan Carlos.

13.     Plaintiff Libia Puerta ("Libia") is, and was at the time the Defendants committed

the crimes alleged in the Complaint, a United States citizen and resident of Florida.  Libia is the

mother of both Jorge and Juan Carlos.  As such, she is a survivor and heir of Juan Carlos.

14.     Plaintiff Alexander Puerta ("Alexander") is, and was at the time the Defendants

committed the crimes alleged in the Complaint, a United States citizen and resident of Florida.

Alexander is the son of Juan Carlos.  As such, he is a survivor and heir of Juan Carlos.

15.     Defendant Chiquita Brands International, Inc. is a New Jersey corporation.

During the time period relevant to this Complaint – *i.e.*, (i) the more than six years during which

Chiquita made over one hundred payments totaling more than $1.7 million to the AUC; (ii) the

more than two years between Juan Carlos Puerta's kidnapping and his murder, during which

4

period he was held hostage and tortured by the AUC; and (iii) the several days in 1999 during which Jorge Porter was kidnapped, held hostage, and tortured by the AUC – Chiquita was headquartered in Cincinnati, Ohio.  Chiquita's illegal and tortious payments to the AUC were designed, reviewed, and approved at its Cincinnati headquarters by senior executives of the corporation, including the Individual Defendants.  In addition, Chiquita and the Individual Defendants instructed Chiquita's employees in the United States and Colombia to carry out their plan to provide material support to the AUC. From April 2012, Chiquita was headquartered in Charlotte, North Carolina until it was acquired in 2015 by a joint venture formed by agribusiness Grupo Cutrale and J. Safra Group.  Chiquita Brands International, Inc. is now privately-owned with its principal office in Rolle, Switzerland (HQ) and its North American office in Fort Lauderdale, Florida.

16.     At all times relevant to the allegations in this Complaint, Chiquita wholly owned and controlled C.I. Bananos de Exportacion, S.A. ("Banadex").  Banadex was headquartered in Medellín, Colombia and produced bananas in the Santa Marta and Urabá regions of northern Colombia.  At all times relevant to the allegations of this Complaint, Banadex was an agent, alter ego, co-conspirator, and joint tortfeasor with Chiquita and with the Individual Defendants, with which it cooperated in a joint criminal enterprise.  For purposes of this Complaint, the term "Chiquita" shall refer to both Chiquita Brands International, Inc. and Banadex interchangeably.

17.     In a factual proffer filed by Chiquita in *United States v. Chiquita Brands International, Inc.*, Case No.: 07-CR-0555 (RCL), in the United States District Court for the District of Columbia ("Chiquita Proffer"), the company identified ten individuals who were actively engaged in planning, approving, and implementing Chiquita's support for the AUC. Though identifying them only by pseudonym, Chiquita has nevertheless acknowledged that those identified individuals, Individuals A-J, actively participated in Chiquita's criminal and tortious

conduct.  Chiquita's has admitted that its "payments to the AUC were reviewed and approved by senior executives of the corporation."  Some of the individuals had in previous years also been actively engaged in planning, approving, and implementing payments by Chiquita to left-wing guerrilla groups.  Other individuals, in addition to the ten specifically identified by Chiquita, including but not limited to the Individual Defendants, were also actively participated in planning, reviewing, approving, and implementing support for the AUC.

18.     Plaintiffs believe they have discovered the true identities of some, but not all, of the individuals involved with actively reviewing, approving, and implementing Chiquita's support for the AUC.

19.     Defendant Robert W. Olson ("Olson") was, at all times relevant to the allegations of this Complaint, a Vice-President, general counsel and secretary of Chiquita.  He served in those positions from 1995 until 2006, when he retired from the company.  Plaintiffs are informed and believe that Olson was identified as "Individual C" in the Chiquita Proffer.

20.     Defendant Robert F. Kistinger ("Kistinger") was, at all times relevant to the allegations of this Complaint, a high-ranking executive for Chiquita.  Kistinger served as Senior Executive Vice-President of the Banana Group for Chiquita from 1994 to 1997 and President and Chief Operating Officer of Chiquita Fresh Group from 1997 until 2008, when he retired from the company.  Plaintiffs are informed and believed that Kistinger was identified as "Individual D" in the Chiquita Proffer.

21.     Defendant William A. Tsacalis ("Tsacalis") was, at all times relevant to the allegations of this Complaint, a Vice-President and Controller for Chiquita.  He served in those positions from 1989 until 2005, when he was promoted to Vice-President of Finance and Treasurer for Chiquita.

22.     Defendant Charles Keiser ("Keiser") was, at all times relevant to the allegations of this Complaint, the general manager of Chiquita's operations in Colombia.

23.     Defendant Steven G. Warshaw ("Warshaw") was, at all times relevant to the allegation of this Complaint, the President, Chief Operating Officer, and a director for Chiquita. Warshaw served in those positions from 1997 until 2002, when he resigned from the company. Before 1997, Warshaw served as Chiquita's Chief Administrative Office and as its Chief Financial Officer from 1990 until 1997.

24.     Defendant Keith E. Lindner ("Lindner") was, at all times relevant to the allegations of this Complaint, the Vice-Chairman for Chiquita.  Linder served in that position from 1997 to 2002, when he retired from the company.  He also served as Chiquita's President and Chief Operating Officer from 1989 to 1997.  Lindner is the son of Carl H. Lindner, the then Chairman of the Board of Directors and Chief Executive Officer of Chiquita.  Together with his father, Carl H. Lindner, Defendant Keith Lindner owned substantial stock interests in Chiquita and exercised control over the company.

25.     Defendant John A. Ordman ("Ordman") was, at all times relevant to the allegations of this Complaint, an employee of Chiquita. He was Chiquita's Senior Vice President, European Banana Sourcing, Chiquita Fresh Group reporting to Defendant Robert F. Kistinger.  He had operational responsibility for Chiquita's operations in Colombia and Defendant Charles Keiser reported to him.  Plaintiffs are informed and believe that Ordman was identified as "Chiquita Employee #2" in the Report of the Special Litigation Committee of Chiquita Brands International, Inc. and was employed at Chiquita from 1994 until 2006.[1]

---

[1] Report of the Special Litigation Committee of Chiquita Brands International, Inc.  at 22, In re: Chiquita Brands International, Inc. Alien Tort Statute and Shareholder Derivative Action, 08-1916-MD-Marra/Johnson (No. 202).

Plaintiffs are also informed and believe that Olson was identified as "Individual J" in the Chiquita Proffer.

## FACTUAL ALLEGATIONS

26.     Chiquita is one of the largest banana producers in the world and a major supplier of bananas throughout Europe and North America.  In 2003, Chiquita reported revenues in excess of $2.6 billion.  For the year ending 2014, Chiquita had annual revenues of more than $3.0 billion with a market capitalization of more than $680 million as of September, 2014. Chiquita currently has operations in nearly seventy countries throughout the world.  At all times relevant to the allegations in this Complaint, Chiquita had operations in the Republic of Colombia.

27.     Colombia is home to some of the most fertile and productive banana-growing lands in the Western Hemisphere.  The country's banana-growing regions are located in remote, rural areas of Colombia along the Caribbean coast near the city of Santa Marta and in the Urabá region.

28.     Since 1899, Chiquita has been growing, exporting, and marketing bananas grown in Santa Marta.  Beginning in 1966, Chiquita expanded its banana operations to even more productive banana-growing lands located in the Urabá region.  Chiquita's operations in Colombia ultimately became the company's most profitable banana-growing business.

29.     Beginning in or around the late 1970s or early 1980s, Colombia's long-running civil war spilled into the Santa Marta and Urabá banana-growing regions.  Leftist guerillas spread violence, fear, and labor strife throughout these regions.  The violence and instability created by the leftist guerillas directly and negatively impacted Chiquita's banana-growing operations.  Chiquita itself became a target of violence, kidnapping, and extortion by leftist guerillas.

30. Chiquita stopped banana operations in Colombian in 1982, in part because of the political turmoil and violence pervading the banana-growing regions.

31. Chiquita returned to Colombia and resumed banana growing operations in 1989. When it resumed operations in Colombia, Chiquita knew that leftist guerillas controlled the banana-growing regions in and around Santa Marta and Urabá. Chiquita knew the leftist guerillas were hostile to its business interests. It also knew the leftist guerillas would demand the payment of "war taxes" and that the leftist guerillas controlled the banana-growing regions through frequent acts of violence, including murder, kidnapping for ransom, and extortion.

32. From approximately 1989 through in or about 1997, Chiquita paid leftist guerillas in order to do business in the Santa Marta and Urabá banana-growing regions. To free itself from the influence and control of leftist guerilla groups, Chiquita and the Individual Defendants made a decision to begin funding, arming, and supporting the AUC during 1996 in an effort to eliminate and exterminate leftist guerillas, their sympathizers, and supporters in the banana-growing regions in order to create an environment where the company's banana-growing operations could flourish.

    **A.**    **Participants In Colombia's Civil War.**

33. For more than fifty years, a state of open hostilities, armed conflict, and civil war has existed in Colombia (the "War"). The War is being waged by three primary groups: the government of Colombia, leftist guerilla groups, and right-wing paramilitary groups.

    **(1)**    **The Government of Colombia.**

34. Colombia is a constitutional, multi-party, democratic republic. Colombia is defending itself in the War against leftist guerilla groups that are seeking to overthrow the government through violence, armed conflict, and subversion.

9

35.     Colombia participates in the War through its security forces, which include the military, national and local police forces, and the Department of Administrative Security ("DAS"), which is responsible for gathering intelligence and investigating violations of law relating to, among other things, national security.

36.     At all times relevant to the allegations in this Complaint, Colombia's security forces were ineffective in the War.  The security forces frequently suffered embarrassing losses and were unable to protect Colombia's citizens, landowners, and businesses from attack, murder, kidnapping for ransom, extortion, and other threats from leftist guerillas.  As a result, many Colombians believed that the leftist guerillas were winning the War.

**(2)     Leftist Guerillas.**

37.     At all times relevant to the allegations of this Complaint, two predominant leftist guerilla groups were actively participating in the War against the government of Colombia.

38.     The Revolutionary Armed Forces of Colombia (*Fuerzas Armadas Revolucionarias de Colombia*, or "FARC") is a Marxist-Leninist politico-military organization established by the military wing of the Colombian Communist Party in 1964 to conduct guerilla warfare against, and seize power from, the government of Colombia.  FARC is Colombia's largest and most active guerilla group.  In 2001, it was comprised of approximately 15,000 to 18,000 combatants who operated on more than 60 fronts.

39.     The National Liberation Army (*Ejército Nacional de Liberación*, or "ELN") is a violent revolutionary Marxist guerilla group founded in 1964 by a pro-Cuban revolutionary group.  The ELN became the second largest guerilla group with approximately 4,000 combatants by 1999.

40.     Both guerilla groups claimed to represent the rural poor in a struggle against Colombia's wealthier classes, aggressively opposed multinational corporations operating in

10

Colombia, and fought against privatization of the country's natural resources, especially by foreign companies.

41.     The guerilla groups financed their operations in the War through, among other things, kidnapping for ransom, bombing, extortion, drug trafficking, and "war taxes" collected from the wealthy.  They also regularly committed murder and destroyed business infrastructure as part of their strategy to maintain their control and influence over local residents and businesses operating in areas they controlled through the use of fear.

42.     Colombian security forces were unable to defeat the leftist guerillas in the Santa Marta and Urabá banana-growing regions of Colombia, and were unable to protect landowners, businesses, and foreign companies operating those areas from violence, kidnapping, or extortion perpetrated by the leftist guerillas.  As a result, FARC and ELN guerillas were free to terrorize individuals and business operations in the area with impunity from the 1980s to the mid-1990s.

43.     The guerilla's terrorist activities during the 1980s caused non-governmental organizations to declare the Urabá region the most violent place in the Western Hemisphere. The Colombian government declared the region a war zone.

44.     In 1997, the United States Secretary of State officially declared both the FARC and the ELN to be Foreign Terrorist Organizations ("FTO") pursuant to 8 U.S.C. § 1189.  As of the date of this Complaint, both remain designated FTOs.

### (3)     The AUC.

45.     The AUC was a violent, right-wing organization in Colombia.  The AUC participated in the War, fighting on the same side as the Colombian government and against the leftist guerillas.

46.     The AUC was formally organized in or about April 1997 to unite a number of loosely-affiliated, regional paramilitary groups that had been formed during the 1980s by

wealthy landowners, businesses, and drug traffickers who were trying to defend themselves against attacks, kidnappings, and extortion by leftist guerillas.  The AUC actively fought against the leftist guerillas in the Santa Marta and Urabá banana-growing regions, as well as almost every other region of Colombia.

47.     Before the AUC was organized, a regional paramilitary group called the Rural Self-Defense Group of Córdoba and Urabá (*Autodefensas Campesinas de Córdoba y Urabá*, "ACCU") was one of the right-wing paramilitary organizations operating in the banana-growing regions.  The ACCU was led by two brothers, Fidel Castaño and Carlos Castaño.  The ACCU became part of the AUC and Carlos Castaño ("Castaño") became the AUC's leader.  At all times relevant to the allegations in this Complaint, Castaño was the AUC's leader.  For purposes of this Complaint, the term "AUC" shall refer to both the AUC, the ACCU, and any other paramilitary organization operating in the banana-growing regions.

48.     The AUC financed its participation in the War through, among other things, financial support it received from sponsors who financed its operations in the War and who paid for protection against leftist guerila attacks, kidnappings, and murders and its extensive involvement in drug trafficking activities.  Sponsors included, among others, wealthy landowners, businesses, and multinational corporations, like Chiquita, with business operations in areas subject to the influence or control of leftist guerillas.

49.     From the time it was formed in 1997 until it began to demobilize in 2004, the AUC grew rapidly.  In 1997, the AUC comprised approximately 4,000 combatants.  By 2001, the AUC claimed to have approximately 11,000 combatants.  When the AUC began to demobilize in 2004, it claimed to have as many as 17,000 armed fighters with an additional 10,000 associated members.

50.     The AUC, like the paramilitary groups that preceded its formation, sided with the Colombian government and became participants in the War against the leftist guerillas.  Because it shared the Colombian government's objective in the War, the AUC consistently coordinated operations with, and received training, equipment, and logistical support from, Colombia's security forces, including the military, police forces, and DAS.

51.     In addition to engaging the FARC and the ELN in direct combat, the AUC, and the paramilitary groups that preceded its formation, participated in the War using strategies and tactics that were illegal under both Colombian and international law.  Among other things, the AUC:

a.      Attacked non-combatant civilians who were accused of being guerillas, guerilla sympathizers, or otherwise supporting guerillas.  As part of its strategy in the War, the paramilitary groups intentionally and deliberately targeted civilians to "cleanse" municipalities and villages of guerilla influences.  "Cleansing" involved the brutal execution, kidnapping, hostage taking for extortion, torture, serious bodily injury, and/or forced disappearance of individuals the paramilitary groups believed to be, in any way, involved with guerillas.  The cleansing operations targeted categories of people who were typically aligned with leftist political movements, such as labor union leaders and members, workers with ties to labor unions, community activists, human rights defenders, and politicians sympathetic to leftist causes.

b.      Used extraordinary brutality and violence against guerillas and civilians who were accused of being guerilla sympathizers and supporters.  The paramilitary groups intentionally and deliberately engaged in extra-judicial killings, massacres, torture, rapes, kidnappings, hostage taking for extortion, serious bodily injury, forced disappearances, and forced displacements as a war strategy to ensure that civilians would never again join or support guerilla groups or causes.  To maximize fear and terror, the paramilitary groups often

13

decapitated, tortured, and dismembered victims.  Among other atrocities, paramilitary units cut

off heads and dismembered bodies with chainsaws, left limbs on fence posts, gutted pregnant

women, poured acid on exposed flesh, and booby trapped stripped and camouflaged bodies with

fragmentation grenades.

        c.     Forcibly displaced entire communities of civilians.  The paramilitary

groups intentionally and deliberately engaged in the forced displacement of entire communities

of civilians as part of a war strategy intended to eliminate logistical support for leftist guerillas.

More than two million Colombians were driven from their homes and communities as a result of

the paramilitary effort to defeat the leftist guerillas in the War.

        d.     Attacked, killed, and forcibly disappeared "socially undesirable" civilians

who were not guerillas or guerilla sympathizers.  As part of its strategy in the War, the

paramilitary groups intentionally and deliberately targeted civilians to cleanse municipalities and

villages of undesirable influences.  The "social cleansing" operations targeted individuals who

were believed to be drug addicts, criminals, prostitutes, street children, homosexuals, and others

deemed socially undesirable by the paramilitary groups.

        e.     The tactics and strategies described in subparagraphs (a) through (d) are

collectively referred to as the "Paramilitary Terrorism Tactics."

     52.     The Colombian security forces used, and directed the actions of, the AUC, and the

paramilitary groups that preceded its formation, as allies, agents, partners, and military assets in

the War against the leftist guerillas.  Colombian security forces deliberately used the paramilitary

groups to employ tactics and carry out missions that would have been illegal under Colombian

and international law.

     53.     The goals, strategies, and tactics of the paramilitary groups fighting leftist

guerillas were widely reported by the news media and well known throughout Colombia and the

world.  More specifically, the Colombian and international media reported concerning the AUC's use of the Paramilitary Terrorism Tactics.

54.     On September 10, 2001, the United States Secretary of State designated the AUC an FTO pursuant to 8 U.S.C. § 1189.  In making the FTO designation, the Secretary of State determined that the AUC threatened the national security of the United States and the safety of U.S. nationals.  The AUC remained a designated FTO until July 15, 2014.

55.     On October 31, 2001, the United States Secretary of State designated the AUC a Specially-Designated Global Terrorist ("SDGT"), pursuant to Executive Order 13224 issued by the President of the United States under authority conferred on him by the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.*  In making the SDGT designation, the Secretary of State found that the AUC had committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy or economy of the United States.  As a result of the SDGT designation, it was a crime for any United States person to, among other things, willfully engage in transactions with the AUC, without having first obtained a license or other authorization from the United States Department of the Treasury.

56.     Around the same time that the United States made its designations, the European Union also designated the AUC as a terrorist organization.

**B.     A Symbiotic Relationship Existed Between The Government Of Colombia And The AUC.  Therefore, The AUC Was Acting Under The Color Of Law.**

57.     A symbiotic relationship existed between the government of Colombia and the AUC.  The symbiotic relationship was so pervasive and intertwined that, at all times and in connection with all events relevant to the allegations in this Complaint, the AUC was acting under the authority or color of law.  Paramilitary units were so deeply integrated into, and so

15

highly coordinated with, the effort by Colombian security forces to defeat the leftist guerillas that they became known as the "Sixth Division" – referring to the paramilitaries' role as an additional division in Colombia's then official five-division army.

58.     The symbiotic nature of the relationship between the Colombian government and the AUC is demonstrated by, among other things, the following:

> **(1)     The Colombian Military Created, Maintained, And Directed Paramilitary Groups As A Central Component Of The Colombian Government's Strategy To Defeat The Leftist Guerillas In The War.**

59.     The tactics employed by the FARC and the ELN in the War included terrorism against civilians and "hit and run" attacks against Colombian security forces.  The leftist guerillas' tactics made it difficult for security forces to defend themselves and impossible for them to protect landowners, businesses, and civilians.  The Colombian military lacked the manpower, resources, or training to effectively fight guerilla warfare through the thousands of kilometers of mountainous jungle terrain and remote rural areas where leftist guerillas maintained strongholds.

60.     In an effort to more effectively combat the leftist guerillas, Colombian security forces, together with political and business leaders, organized private, highly mobile paramilitary groups to hunt and exterminate guerillas and their sympathizers using tactics that were illegal under Colombian and international law.  The tactics included the Paramilitary Terrorism Tactics.

61.     The Colombian security forces' use of paramilitary groups to fight the FARC, the ELN, and other left-wing guerillas was consistent with counterinsurgency training and strategy adopted by the military during the 1960s.  In order to further the military's counterinsurgency strategy, the Colombian security forces were authorized by Colombian law to organize, train, motivate, support, and jointly operate with the paramilitary groups.

62.     Paramilitary groups were organized, trained, and supported by the Colombian military to operate as a central component in the Colombian government's strategy to defeat the leftist guerillas in the War.  At all times relevant to the allegations in this Complaint, the Colombian security forces used, supported, and directed paramilitary groups as allies, partners, agents, and military assets in the War against leftist guerillas.

63.     Joint operations and unity with Colombian security forces were facilitated by manning paramilitary groups with active duty and retired military personnel, national police officers, and other members of Colombia's security forces, as well as civilian fighters.  No clear division existed between military units and paramilitary groups because active duty members of Colombia's military regularly moved back and forth between military units and paramilitary groups during the course of operations against suspected leftist guerillas, their sympathizers, and supporters.

64.     Colombian security forces trained paramilitary groups.  Among others, the military trained Carlos Castaño, who helped organize the ACCU during the 1980s and became the AUC's leader in 1997.  The military trained other individuals specifically to organize and lead paramilitary groups in other parts of Colombia.

65.     Colombian security forces armed paramilitary groups.  Among other things, the military provided paramilitary groups with arms and ammunition that were restricted by law to use by military personnel only.  The Colombian government also authorized its state-owned weapons and ammunitions manufacturer to sell arms to paramilitary groups so they could participate in the War.

66.     Colombian security forces provided paramilitary groups with sophisticated communications equipment.  Colombian security forces gave paramilitary groups powerful two-way radios that allowed them to communicate with each other and with the Colombian military.

67.     Colombian security forces and paramilitary groups shared intelligence. Paramilitary groups were used to gather intelligence about leftist guerillas and their sympathizers and supporters in the regions where they operated.  The paramilitary groups communicated their intelligence to military intelligence units and to the DAS.  Military intelligence and DAS units reciprocated by sharing intelligence information with the paramilitary groups including, but not limited to, lists of individuals the Colombian government suspected of being leftist guerillas, sympathizers, or supporters.  Colombian security forces often directed the AUC to kill or torture individuals identified on these lists.

68.     Colombian security forces clothed paramilitaries with government authority. Military personnel entered villages and announced that the paramilitary groups accompanying them were a legal organization supported by the Colombian government.  Thereafter, military personnel expressly instructed the local political leaders, police forces, and businesses to collaborate with the paramilitaries, including providing financial support for the paramilitary groups.

69.     Colombian security forces conducted joint operations with paramilitary groups as part of Colombian government's strategy to hunt and exterminate leftist guerillas, together with their sympathizers and supporters.  The military selected targets, planned operations with paramilitary leaders, and issued operational orders for carrying out the missions.  As part of the joint operations, paramilitary groups were assigned anti-guerilla operations that the military could not lawfully carry out and used Paramilitary Terrorism Tactics the military could not lawfully employ.  For example:

a.      La Honduras/La Negra Farms Massacres.

i.      On March 4, 1988, the military and paramilitary groups participated in massacres at two different farms in the department of Antioquia.  In the weeks

18

preceding the massacre, military personnel arrested some of the eventual victims and photographed them.  The military detained and tortured other individuals to obtain intelligence information about leftist guerillas.  On the day of the massacre, military and paramilitary soldiers searched for twenty men by name at the two farms.  Paramilitary groups executed the men.

        ii.       A judicial investigation determined the massacre was a highly coordinated operation carried out jointly by a paramilitary group and four army brigades.

        b.       <u>The First Segovia Massacre</u>.

        i.       On November 11, 1988, the military and paramilitary groups participated in a joint operation against leftist guerillas and their sympathizers in the village of Segovia in the department of Antioquia.  Within an hour, forty-three people were massacred and forty-six others injured using Paramilitary Terrorism Tactics.  The military and paramilitary groups selected the victims by name using a prepared list of people suspected of being leftist guerillas or their sympathizers and supporters.

        ii.       The military facilitated the paramilitary units' entry into and exit from Segovia.  Three army officers and two police officers were indicted for their role in the massacre.

        c.       <u>The La Rochela Massacre</u>.

        i.       On January 18, 1989, paramilitary groups massacred two judges and ten investigators near La Rochela, in the Department of Santander.  The judges and investigators were, at the time, investigating the military's involvement with paramilitary groups' Paramilitary Terrorism Tactics.

        ii.       An investigation linked the massacre to a paramilitary unit operating under orders from a battalion commander in the Colombian Army's Fourteenth

Brigade.  A Colombian court determined that Colombian security forces had organized the massacre.

> d.      The Second Segovia Massacre.

> i.      On April 17, 1989, the evening before a strike organized by leftist guerillas, the military and paramilitary groups entered the municipality of Segovia for the second time.  Upon entering the town, the military forced residents of Segovia into their homes and took control of the village streets.  Leaflets signed by a paramilitary group were then posted on homes and businesses warning inhabitants not to participate in the strike.  On April 22, 1989, five days later, gunmen entered Segovia, executed fourteen people, and injured fifteen others.

> ii.      The military coordinated the transportation of the gunmen employed during the April 22, 1989 massacre, housed them at a nearby military base until the massacre, and then facilitated their entry into and exit from Segovia.

70.      By the end of 1989, paramilitary units were responsible for dozens of massacres and thousands of killings.  Throughout this period of time, Colombian security forces maintained a symbiotic relationship with paramilitary groups in many of Colombia's administrative departments – including Antioquia, the administrative department in which the Urabá banana-growing region is located, and Magdalena, the administrative department in which the Santa Marta banana-growing region is located.

> **(2)      The Colombian Government Criminalize All Involvement With Paramilitary Groups.**

71.      The Paramilitary Terrorism Tactics used by the military and paramilitary groups during the War caused an outcry in the international community.  Foreign nations, non-governmental organizations, and human rights advocates expressed concern that the military's

close involvement with paramilitary groups indicated that the Colombian government was promoting war crimes, crimes against humanity, human rights abuses, and other violations of international law.

72.     In June 1989, the Colombian government responded to international pressure by making it a crime for anyone, including Colombia's security forces, to recruit, train, promote, organize, finance, or belong to paramilitary groups.  ("Anti-Paramilitary Law").

73.     When it enacted the Anti-Paramilitary Law, the government of Colombia was still incapable of defeating the leftist guerillas in the War and also still incapable of protecting wealthy Colombians, landowners, and businesses, including multinational corporations like Chiquita, from attack and extortion by leftist guerillas.  Without paramilitary groups, the Colombian government could not guarantee public safety.

> **(3)     The Colombian Government Enacted Legislation To Continue Using Paramilitary Groups As A Central Component In Its Strategy To Defeat Leftist Guerillas.**

74.     Even after it had made it a crime to be involved with paramilitary organizations, the Colombian government continued using paramilitary groups as a central component of its strategy in the War through new regulations and legislation that authorized security forces to continue organizing, training, arming, directing, and jointly operating with paramilitary groups and that also authorized landowners and businesses to lawfully continue financing paramilitary operations.

> **(i)     Defense Ministry Order 200-05/91 Authorized Security Forces To Continue Using Paramilitary Groups To Carry Out The Colombian Government's War Strategy.**

75.     In May 1991, the Colombian Defense Ministry promulgated Order 200-05/91, which authorized the military to create, control, and operate civilian intelligence networks for the specific purpose of combating leftist guerillas.  In all material respects, Order 200-05/91

21

constituted formal authorization for Colombian security forces and paramilitary groups to continue their existing symbiotic relationship.  For example, under Order 200-05/91:

      a.      Intelligence network members and operations were covert;

      b.      The intelligence networks employed active duty officers, retired military personnel, and civilians.

      c.      Division and brigade commanders, or their equivalents, had operational command and control responsibility for the intelligence networks.

      d.      Security forces were authorized to recruit, select, organize, train, equip, arm, and direct members of the intelligence networks.

      e.      The military were authorized to "establish the targets and the technique to use" in connection with intelligence network operations.

      f.      The military continued to notify municipalities and villages that the paramilitaries working with them were lawful organizations supported by the government and continued to instruct landowners and businesses to pay paramilitaries to support their efforts in the War instead of paying leftist guerilla "war taxes".

      g.      Colombian security forces were authorized to continue sharing intelligence with paramilitary units.  This intelligence included but was not limited to lists identifying the names of suspected leftist guerillas and their sympathizers and supporters.

      h.      The military continued to select individuals for assassination and assign paramilitary groups the task of carrying out the assassinations.

76.      Under Order 200-05/91, Colombian security forces continued using paramilitary groups as military assets in the War, continued directing their operations, and continued to assign them missions that required using Paramilitary Terrorism Tactics that were unlawful under Colombian and international law.

(ii)     *Convivir* **Legislation Was Enacted To Continue The AUC's**
                  **Central Role In The Colombian Government's War Strategy.**

77.     By 1994 leftist guerilla violence was continuing to increase, particularly in

remote, rural areas of Colombia, including the banana-growing regions in Santa Marta and

Urabá.

78.     In February 1994, the Colombian government enacted Decree 356 of 1994, which

authorized civilians in high-risk areas to create private security services, called *convivir*, for their

own protection.  Like Order 200-05/91, Decree 356 provided a framework for the Colombian

government to continue using paramilitary groups as a central component in its strategy to defeat

the leftist guerillas and to protect wealthy Colombians, landowners, and businesses, including

multinational corporations like Chiquita, from attack and extortion.

79.     Decree 356 continued and magnified the symbiotic relationship between

Colombian security services and paramilitary groups.  The Decree continued the symbiotic

relationship by giving *convivir* an organizational and operational structure that paralleled the

paramilitary model.  Furthermore, the Decree magnified the symbiotic relationship by giving

*convivir* government support.  For example, under Decree 356:

a.     Wealthy individuals, landowners, and businesses were authorized to create

and sponsor a *convivir* in high-risk or combat areas where the Colombian government could not

guarantee public safety.

b.     *Convivir* sponsors, including multinational corporations like Chiquita,

were legally authorized to finance the *convivir* operations by making payments directly to them.

23

       c.     *Convivir* members were authorized to carry arms and protect their sponsors by engaging leftist guerillas.

       d.     The identity of *convivir* members was a secret known only to the Colombian security forces and local police chiefs.

       e.     An agency of the Colombian Defense Ministry was directly responsible for licensing and supervising *convivir*.

       f.     The Colombian military was actively involved in organizing *convivir*.

       g.     *Convivir* members were often retired soldiers who had been recommended to the *convivir* by Colombian military commanders in the local area.

       h.     The Colombian military was legally authorized to arm *convivir* with weapons and ammunition that would otherwise have been restricted only to military use.

       i.     *Convivir* members and sponsors were connected by and communicated with two-way radios.

       j.     *Convivir* conducted intelligence operations and shared intelligence with the Colombian military and local police.

       k.     *Convivir* worked closely with Colombian security forces and with local police to jointly patrol the area of their responsibility and jointly respond to aggression by leftist guerillas and other emergencies.

       l.     *Convivir* participated with the Colombian military in joint operations against leftist guerillas.  Often, Colombian security forces assigned *convivir* to fight battles because they had better resources and were able to use Paramilitary Terrorism Tactics that were unlawful under Colombian and international law.

       m.     *Convivir* participated in security meetings with local officials.

80.     In the Santa Marta and Urabá banana-growing regions, political, military, and business leaders, including Chiquita and the Individual Defendants, knew that all of the *convivir* belonged to, and were operated by, the AUC.  By authorizing the funding, arming, and sharing of intelligence with *convivir*, leaders in those regions knowingly and deliberately used *convivir* groups to continue the symbiotic relationship between the Colombian government and paramilitary groups.  Furthermore, political and military leaders in those areas intended that the AUC actively participate in the War and combat leftist guerillas, their sympathizers, and their supporters through *convivir*.

   (4) **As Part Of The Government's War Strategy, Colombian Security Forces Continued To Jointly Plan And Carry Out Operations With Paramilitary Groups Using Paramilitary Terrorism Tactics.**

81.     After implementing Order 200-05/91 and Decree 356, the Colombian government continued to use the AUC as a central component in its strategy for defeating the FARC and the ELN in the War.  Among other things, Colombian security forces continued to jointly plan, coordinate, and carry out operations with paramilitary groups, including engaging paramilitary groups to carry out assignments using Paramilitary Terrorism Tactics that were unlawful under Colombian and international law.

82.     In 1997, and throughout the period of time relevant to the allegations in this Complaint, the Colombian military and the AUC planned, coordinated, and participated in joint offensives against leftist guerillas.  According to AUC leaders, the joint offensives were designed to conquer various regions of Colombia and also to deny leftist guerillas future logistical support by, among other things, terrorizing residents and forcing them to abandon villages that were sympathetic to the leftist guerillas.

83.     The military selected targets for attack, coordinated the attacks with paramilitary leaders, issued operating orders to paramilitary groups, and also provided logistical support for

the attacks.  Colombian security forces also provided paramilitary groups with arms, equipment, and intelligence to carry out the operations.

84.      In connection with the operations, the AUC also operated under the direction of, and in coordination with, Colombian security forces.

85.      In connection with the operations, the AUC was given assignments that required the use of Paramilitary Terrorism Tactics.

86.      In connection with the operations, Colombian security forces participated in the Paramilitary Terrorism Tactics.  For example:

      a.      <u>The Mapiripán Massacre</u>.

          i.      In July 1997, as part of a coordinated offensive against leftist guerillas, the Colombian Army's Seventeenth Brigade and the AUC participated in a joint operation in Mapiripán, in the department of Meta.  As determined by the Inter-American Court of Human Rights, the military and AUC jointly and meticulously planned the operation over the course of several months.  According to AUC leaders, Mapiripán was selected as a target because it was a cocaine trade center used as a source of income for leftist guerillas.  The operation was intended to deprive leftist guerillas of an important source of financing.

          ii.      The military facilitated and participated in the operation.  Among other things, it permitted the AUC to make "irregular flights" from Urabá and land at a civilian airport under military control in Meta.  The military provided military vehicles to transport the AUC fighters from the airport to Mapiripán.  When the AUC surrounded Mapiripán on July 15, 1997, they wore uniforms that were exclusively used by the military, had weapons and munitions restricted to military use, and used high frequency radios.

          iii.      Over the course of seven days, the AUC tortured, dismembered, eviscerated, and decapitated at least forty-nine people in Mapiripán.  Despite repeated requests

26

from residents, including a municipal judge, the military waited one week before entering

Mapiripán.  Before the military entered, helicopters were permitted to land in Mapiripán and fly

an injured AUC fighter out of the area.

        b.    <u>The El Aro Massacre</u>.

        i.    In October 1997, the Army's Fourth Brigade and the AUC

participated in an offensive in the village of El Aro, in the department of Antioquia.  Like the

Mapiripán massacre, the military and AUC leaders planned the offensive over the course of

several months.

        ii.    As the offensive began, the Colombian Army established a

perimeter to prevent entry into or escape from the village while the AUC was inside.  The Army

maintained the perimeter for five days.  During that time, the AUC executed at least eleven

people, forcibly disappeared more than thirty other people, burned forty-seven of the sixty-eight

houses, looted stores, and destroyed water pipelines.  At least one victim was tied to a tree and

tortured by having his eyes gouged out and his testicles cut off.  After the massacre, the AUC

forced most of the residents to leave the area.

        iii.    Several members of the Army and local police were charged with

participating in the massacre.

        c.    <u>The El Salado Massacre</u>.

        i.    In February 2000, the military and the AUC participated in an

offensive in the village of El Salado, in the Bolivar department.  As with other massacres,

military and AUC leaders jointly planned the offensive in advance.  El Salado was chosen as a

target for the operation because of the area's long-standing, strong leftist guerilla presence.

        ii.    In February 2000, approximately three hundred paramilitary troops

entered the village, announced themselves, and used a list of names to summon individuals

believed to be leftist guerillas, or their sympathizers and supporters, to a basketball court used as the village square.  Over the course of three days, the AUC executed, tortured, and raped civilians.  By the time they left, the AUC had killed at least 36 people.  Some were shot after being tortured.  Others were stabbed or beaten to death.  Others were strangled.

        iii.      Shortly after the AUC troops entered the village, the military set up roadblocks and prevented anyone from entering the village or attempting to rescue the residents. The military maintained the roadblock for three days and did not enter the village until approximately one hour after the AUC had departed.  In addition, when one of the AUC fighters was injured while trying to drag victims from their home, a helicopter was allowed to fly into the village to rescue him.

        d.      The Chengue Massacre.

        i.      On January 17, 2001, the military, local police, and the AUC participated in an offensive in the village of Chengue, in the Sucre department.

        ii.      On January 17, 2001, approximately eighty AUC fighters entered the village and rounded up the men.  Shortly thereafter, the AUC troops killed twenty-four people by smashing their skulls with stones and a sledgehammer.

        iii.      One of the perpetrators later testified that the massacre was organized by, among others, police and Colombian Navy officials.

87.      In addition to joint operations against entire villages and municipalities, the military and the AUC also jointly planned and coordinated the selective assassination of suspected leftist guerillas and their sympathizers and supporters.  Military intelligence units selected the individuals for assassination then hired and paid AUC gunmen using authority given to them under Order 200-05/91.

28

88.     In 1997, a colonel in the Colombian military confirmed to the United States Department of State that Colombian security forces and paramilitary units had been "cooperating for a number of years."  He also informed the United States that the level of cooperation between the military and the AUC in the Santa Marta and Urabá regions had "gotten much worse" since 1996.  The increase in the level of cooperation coincided with the time period military and AUC leaders began planning and implementing their offensive to drive leftist guerillas out of the banana-growing regions.

89.     As a result of the joint military-paramilitary operations, leftist guerillas were defeated and driven out of various regions of Colombia, including the banana-growing regions of Santa Marta and Urabá.

90.     As a further result of the joint military-paramilitary operations, the AUC killed, injured, or forcibly disappeared thousands of people in the Santa Marta and Urabá banana-growing regions during the course of efforts by Colombian security forces and the AUC to defeat the leftist guerillas using Paramilitary Terrorism Tactics.

### (4)     As Part Of The Colombian Government's War Strategy, Traditional Governmental Functions And Roles Were Ceded To The AUC.

91.     As an additional part of its plan for defeating the FARC and the ELN, the Colombian government effectively ceded control of traditional state functions to the AUC in remote, rural areas regained from leftist guerillas.  Control of these areas was ceded to the AUC because Colombian security forces were incapable of guaranteeing public safety or preventing the leftist guerillas from returning.  Therefore, the Colombian government deliberately used the AUC to maintain control and protect civilians and businesses from guerilla attack and extortion in areas regained from the leftist guerillas.

92.     As a consequence, the AUC effectively became the state in many parts of the Santa Marta and Urabá regions.

93.     When fulfilling its state functions, the AUC operated in public, often located its headquarters inside municipalities, and worked in open coordination with local political, military, and police leaders.

94.     The AUC set up secure perimeters to protect villages and municipalities from attacks by leftist guerillas who were seeking to regain control of the area.  The AUC also established visible bases and maintained check points along public roads.  The military and police forces regularly passed through, and cooperated with, the AUC check points.

95.     The AUC continued to share information and coordinate operations with the military to maintain control and protect the area from guerilla attack.  In fulfilling this state function, the AUC notified the military of any leftist guerilla presence in the area and aided the military if it was attacked.

96.     The AUC assumed police authority and became local law enforcement agents responsible for identifying, locating, and punishing criminals.

97.     The AUC also functioned, from time to time, as judges to resolve local disputes between residents in the communities.

98.     The AUC used Paramilitary Terrorism Tactics in order to drive the leftist guerillas out of the banana-growing regions, to maintain control over those regions after regaining control, and to carry out the traditional state functions ceded to it by the Colombian government.

99.     As a result of the Colombian government ceding traditional state functions to the AUC, thousands of people were killed, injured, kidnapped, or forcibly disappeared by the AUC's use of Paramilitary Terrorism Tactics.

**(5)     Paramilitarism Was More Than A War Strategy.  It Was State Policy.**

100.     According to sworn testimony given by a new AUC leader, Salvatore Mancuso, "paramilitarism was state policy" in the Republic of Colombia during all times relevant to the allegations in this Complaint.

**(i)     Leaders Integrated The AUC Into The Political Process.**

101.     The symbiotic relationship between the Colombian government and the AUC extended to local, regional, and national political leaders, including those from the Santa Marta and Urabá banana-growing regions.  Relationships with political leaders integrated the AUC into the political process and gave it the ability to influence decision- and policy-making at all levels of government.

102.     On September 28, 2000, AUC leaders and approximately four hundred municipal and provincial authorities met in the town of Chivolo, in the Magdalena department.  During the meeting, AUC and Magdalena political leaders, among other things, jointly agreed to politically support a governor and various congressmen who were affiliated with the AUC.  ("Pact of Chivolo").

103.     At another point in time during 2000, AUC leaders and regional candidates for gubernatorial and mayoral offices met in a southern region of Colombia to allocate political support, public contracts, and public resources.

104.     At another point in time during 2001, AUC leaders and congressmen for the department of Antioquia met in Puerto Berio to allocate political support, public contracts, and public resources.

105.     At another point in time during 2001, AUC leaders and candidates for mayoral and congressional offices met in the town of Pivijay, in the department of Magdalena.  During the meeting, AUC and Magdalena political leaders agreed to support, among other things, a joint political campaign with the AUC in connection with mayoral and congressional offices in the department.

106.     On July 23, 2001, approximately forty AUC and political leaders, including seven members of congress, four senators, two governors, and five mayors, met in the town of Santa Fe de Ralito in the department of Córdoba.  ("Pact of Ralito").  In the meeting, the AUC and political leaders, among other things, jointly agreed to "refound[] the country," develop and sign a new social contract, and maintain national independence.

> **(ii)     Political, Military, And Intelligence Leaders Integrated The AUC Into All Levels Of The Colombian Government.**

107.     According to information developed through an investigation being conducted by the Attorney General and the Supreme Court of Colombia, there has been an ongoing, long-term collaboration between high-ranking government officials and the AUC.  The collaboration consisted of systemic efforts by officials at all levels and all branches of Colombian government to ally with, aid, and support the AUC.

108.     The investigation targeted political leaders at all levels of government.  In addition, many local government officials have also been identified as collaborating and cooperating with the AUC in their local areas, including governors, mayors, and police officials in the political departments where the decedent in this case resided and was murdered.

109.     The investigation also identified a large number of military personnel who had collaborated with, and directed the operations of, the AUC over a long period of time.  The investigation included military officers who collaborated and coordinated with the AUC in the

Santa Marta and Urabá banana-growing regions and who engaged in Paramilitary Terrorism

Tactics.  Among others currently in custody after being charged with participating in

Paramilitary Terrorism Tactics is General Rito Alejo del Rio Rojas, who was responsible for

military operations in the Urabá banana-growing region from 1995 through 1997.  According to

AUC leaders, the coordination and support provided by General del Rio were among the most

important factors allowing the AUC to oust the FARC and the ELN guerillas from Urabá.

Because of his substantial support and coordination, General del Rio became known as the

"father of paramilitaries."

110.    The investigation also revealed extensive collaboration between the DAS and the

AUC in Paramilitary Terrorism Tactics.  Among other things, the DAS shared intelligence

information concerning leftist guerillas and suspected sympathizers, gave the AUC wire

intercepts, altered or erased the histories of AUC members contained in government intelligence

databases, and collaborated concerning support for candidates in municipal, gubernatorial, and

presidential elections.  Among others placed in custody was Jorge Noguera, who was the head of

the DAS in 1999 when Jorge was kidnapped.  The DAS' support facilitated the AUC's

kidnapping of Piedad Córdoba, a well-known human rights negotiator, who was kidnapped in the

same area only a few days after the AUC released Jorge.

C.    **Chiquita Purposefully Aided And Abetted The AUC's Use Of The Paramilitary Terrorism Tactics.**

111.    Until approximately 1997, leftist guerillas controlled the rural northern areas of

Colombia, including the banana-growing regions in and around Santa Marta and Urabá regions.

112.    At all times relevant to the allegations in this Complaint, the Colombian security

forces were unable to defeat the leftist guerillas operating in the banana-growing regions and

were unable to protect landowners and businesses from guerilla attacks, kidnappings for ransom,

massacres, murders, and extortion.  During the 1980s and continuing until sometime in the late 1990s, the Colombian security forces had lost control of the banana-growing regions to the FARC and the ELN.

113.    Without any meaningful opposition from Colombian security forces, leftist guerillas in the Santa Marta and Urabá banana-growing regions created an environment of violence, fear, and danger.  Landowners and businesses were regularly subjected to kidnappings for ransom, murders, property damage, extortion, and "war taxes".  Banana workers and citizens in communities surrounding the banana farms were repeatedly subjected to murder, torture, and massacre by leftist guerillas.

114.    In or around 1982, Chiquita ceased many of its banana operations in Colombia, in part because of the political turmoil and violence pervading the banana-growing regions.

115.    In 1989, Chiquita returned to Colombia and resumed banana operations in Santa Marta and Urabá.  Upon returning, Chiquita formed Banadex to control all of its business operations in Colombia.  By the mid-1990s, all of Chiquita's Colombian subsidiaries were consolidated under the management of Banadex and its general manager.

116.    At the time it resumed operations in Colombia, Chiquita knew that leftist guerillas controlled the banana-growing regions in and around Santa Marta and Urabá.  Chiquita knew the leftist guerillas were hostile to its business interests.  Chiquita knew the leftist guerillas would demand the payment of "war taxes" and that the leftist guerillas controlled the banana-growing regions through almost daily acts of violence, including murder, kidnapping for ransom, and extortion.   Chiquita knew that its executives, employees, and property would be subject to attack by leftist guerillas.

117.    As a result, Chiquita knew it would be required to deal with the FARC, the ELN, and other leftist guerillas groups in order to operate its banana growing business.

118.     Notwithstanding its knowledge of the dangers and risks, Chiquita first resumed, and then steadily expanded, banana operations in the leftist guerilla-controlled banana-growing regions in and around Santa Marta and Urabá.  Among other things, Chiquita purchased a large number of banana farms and became a large landowner with approximately 9,500 acres of farmland in the Santa Marta and Urabá banana-growing regions.  Chiquita also steadily increased its workforce to support its expanding banana operations.  By the mid-1990s, it employed, through Banadex, approximately 4,000 people in the banana-growing regions.

**(1)     FARC And Other Leftist Guerillas Damaged Chiquita's Banana Operations By Creating A Hostile And Dangerous Environment In Santa Marta and Urabá.**

119.     Shortly after Chiquita resumed business operations in Santa Marta and Urabá, FARC and ELN guerillas began killing Chiquita's banana workers and causing damage to its physical infrastructure.

120.     In and around the same period of time, the FARC began to extort Chiquita by demanding payments from the company.  Chiquita executives understood that the FARC intended to kidnap its employees if the payments were not made.

121.     In order to continue doing business in the Colombian banana-growing regions, Chiquita began making regular payments to FARC and other leftist guerilla groups.  At various times, Chiquita also made payments to the ELN.  High-ranking officers in Chiquita's world-wide headquarters were informed of, and approved, payments to the FARC and the ELN.

122.     Chiquita made regular payments to the FARC and the ELN from in or about 1989 through in or about 1997, when the FARC and the ELN controlled the Santa Marta and Urabá banana-growing regions.

123.    Notwithstanding regular payments, the FARC and the ELN guerillas continued to violently attack banana workers and infrastructure.  The attacks affected Chiquita's operations in the Santa Marta and Urabá banana-growing regions.

124.    In 1990 or 1991, leftist guerilas kidnapped Chiquita's security director in Colombia and held him for ransom.  Chiquita was forced to negotiate for the director's release.

125.    Between 1991 and 1997, leftist guerilas kidnapped and held for ransom at least three other Chiquita employees.

126.    In or about 1992, the ELN destroyed Chiquita's wharf in the city of Turbo.

127.    During the four months between September and December 1993, leftist guerilas killed more than 220 banana workers in the Urabá region.  Even though the area was experiencing high unemployment rates, the frequent slaughter of banana workers by the FARC and the ELN made it difficult for banana growers to find enough employees willing to work.  According to press reports, the leftist guerilla-fueled violence resulted in a twenty percent reduction in the production and export of bananas from Urabá.

128.    During 1993, leftist guerillas forcibly shut down operations at a number of banana farms, preventing landowners and banana workers from cultivating the land.  According to press reports, growers expected the leftist guerilla violence to reduce banana production for the year by up to twenty-five percent in comparison to the previous year.

129.    In 1995, leftist guerillas bombed a packing station owned and operated by Chiquita.

130.    On August 30, 1995, seventeen banana workers were massacred by leftist guerrillas with automatic weapons during a raid on a banana plantation.  The guerillas lashed the banana workers hands behind their back, forced them to lay face-down on a muddy soccer field, then shot them in the head.

36

131.    On August 31, 1995, banana workers went on strike to demand protection from leftist guerillas.  The strike shut down all banana operations in the Urabá region.  At the time of the strike, Urabá accounted for 70% of all banana exports from Colombia.

132.    On September 20, 1995, leftist guerillas massacred twenty-six banana workers. Leftist guerillas made the workers lie down in a ditch beside a road and then shot them, point blank, in the back of the head.  Leftist guerillas captured and shot the workers only a few minutes' drive from a military base.

133.    The violence caused even more banana workers to flee Urabá.  As a result, Chiquita and other banana producers continued to encounter difficulty finding enough employees.  According to press reports, growers and producers in the area expected banana production to drop by twenty-five percent in comparison to the previous year.

134.    In 1996, leftist guerillas bombed another packing station owned and operated by Chiquita.

135.    In or around 1996 or 1997, leftist guerillas ambushed, shot, and wounded Chiquita's Colombian Quality Control Director and his bodyguard while they were inspecting banana farms in a company car.  The leftist guerillas spared the Quality Control Director's life only after discovering that he was not the general manager of Banadex, who was their intended target and was reportedly Chiquita's most senior employee in Colombia.

136.    In or around 1996 or 1997, leftist guerillas ambushed two cars carrying the general manager of Banadex and Chiquita executives who were traveling to a company farm in Santa Marta.  The leftist guerillas opened fire on both cars with automatic weapons.  Chiquita's employees escaped unharmed and evaded capture only because the cars were bullet-proof.

**(2)    Colombian Security Forces Were Incapable Of Defending Chiquita Against Leftist Guerilla Attacks.**

137.    At all times relevant to the allegations in this Complaint, Colombian security forces were incapable of protecting Chiquita, its executives, employees, and infrastructure, from attacks by FARC and ELN guerillas.

138.    Local and national law enforcement agencies were incapable of protecting Chiquita against the FARC and the ELN guerillas.  Local law enforcement agencies lacked the weapons, training, and personnel to successfully confront the leftist guerillas.  In addition, the effectiveness of most local police agencies was degraded by rampant corruption.  The national police force was equally ineffective at confronting leftist guerillas and incapable of protecting Chiquita from attack.

139.    Colombia's military could not protect Chiquita.  In fact, the military was unable to defend itself from attack by leftist guerillas.  Throughout the 1980s and 1990s, the FARC and the ELN regularly attacked military bases, killed soldiers, and stole weapons, munitions, and equipment.

140.    On several occasions, the Colombian Army demonstrated its inability to protect Chiquita from attack by leftist guerillas.  For example, following the destruction of its wharf in Turbo, Chiquita asked the military for help.  The military informed Chiquita that it could not respond promptly because it did not have flashlights and fuel.

141.    In late 1994, the military notified Chiquita that intelligence indicated that leftist guerillas intended to attack two Chiquita facilities.  In a January 8, 1995 letter concerning the impending attacks, Brigadier General Alvarez Vargas of the Colombian Army informed the company that the military could not provide protection.  Instead, General Alvarez recommended that the company "make a greater commitment to increase and improve [its] own security."

> **(3)    Chiquita And The Individual Defendants Knowingly Agreed To Provide The AUC With Substantial Assistance And Material Support To Pacify The Banana-Growing Regions.**

142.     In late 1996 or early 1997, Keiser and another Chiquita executive from Colombia, participated in a meeting of banana growers to discuss security issues arising from leftist guerilla activity in the Urabá region.  The meeting was also attended by Carlos Castaño, the leader of the AUC. ("Castaño Meeting").

143.     Keiser and the other Chiquita executive recognized Castaño and were familiar with the AUC.  Among other things, they knew the AUC was a participant in the War against the leftist guerillas.  They also knew that the AUC used the Paramilitary Terrorism Tactics as part of its strategy for defeating the leftist guerillas and protecting landowners and businesses.  From information widely reported in the Colombian media, Keiser and Chiquita's other executive knew that the AUC's tactics included, among other things, massacres, extra-judicial killings, kidnappings, forced disappearances, torture, and forced displacements.

144.     During the Castaño Meeting, Castaño told Keiser and Chiquita's other executive that the AUC had begun a sustained offensive to drive the leftist guerillas out of the Urabá region.  Because of what they knew about Castaño and the AUC, Keiser and Chiquita's other employee understood that the AUC intended to use the Paramilitary Terrorism Tactics.

145.     Castaño asked that Chiquita and Keiser support the AUC in its War effort against the leftist guerillas in two ways.  First, Castaño asked that Chiquita and Keiser stop making payments to the leftist guerillas.  Second, Castaño asked that Chiquita and Keiser begin paying the AUC.

146.     Castaño informed Keiser and Chiquita's other executive that the AUC would use money it received from Chiquita to finance Paramilitary Terrorism Tactics that would be used to drive the leftist guerillas out of the Urabá banana-growing region; protect the company, its executives, employees, and infrastructure from future attacks by leftist guerillas; and create a

business and work environment that would enable Chiquita's Colombian banana-growing operations to thrive.

147.    At the Castaño Meeting, and at all relevant times thereafter, Chiquita and the Individual Defendants took sides with the AUC in the War against the leftist guerillas and helped to finance and assist the AUC's efforts in that War.

148.    At the Castaño Meeting, and at all relevant times thereafter, Chiquita and the Individual Defendants knowingly agreed, and acted with the intent, to aid and abet the AUC's use of Paramilitary Terrorism Tactics to drive leftist guerillas out of, and maintain control over, the Urabá banana-growing region.

149.    The Colombian military and other defense forces also asked Chiquita and Keiser to provide substantial assistance to the AUC through the *convivir* to assist the military and the AUC in their joint effort to drive the leftist guerrillas out of the banana-growing regions and to maintain control over those regions after regaining control.

150.    As a consequence, following the Castaño Meeting, Chiquita and the Individual Defendants adopted a plan to knowingly and intentionally provide substantial assistance and material support to enable the AUC to use Paramilitary Terrorism Tactics for the purpose of (i) driving leftist guerillas out of the Urabá banana regions; (ii) maintaining control over the banana-growing regions; and (iii) creating an environment where the company's banana-growing operations could prosper.

151.    According to information developed by the Attorney General for the Republic of Colombia, the agreement between Chiquita and the Individual Defendants and the AUC constituted a "criminal relationship" to bring about the "bloody pacification" of the banana-growing regions.

152.    The assistance provided by Chiquita and the Individual Defendants had a substantial effect on the AUC's ability to successfully employ the Paramilitary Terrorism Tactics in the two regions.  Chiquita and the Individual Defendants knew the AUC was using its assistance to employ the Paramilitary Terrorism Tactics.

>           **(4)    Chiquita And The Individual Defendants Knowingly Provided Substantial Assistance And Material Support To The AUC When It Made More Than 100 Payments Totaling Over $1.7 Million Between 1996 And 2004.**

153.     For more than seven years – from in or about 1996 through on or about February 4, 2004 – Chiquita and the Individual Defendants, through Banadex, provided substantial assistance to the AUC in the form of money.  Chiquita paid the AUC, directly or indirectly, nearly every month.  Chiquita made over 100 payments to the AUC totaling over $1.7 million during that period of time.

154.    Payments made by Chiquita and the Individual Defendants to the AUC were designed, reviewed, approved, and implemented by the Individual Defendants, and other senior executives of the corporation, whose names and identities are not yet known to Plaintiffs, including high-ranking officers, directors, and employees, at the company's corporate headquarters in Cincinnati, Ohio and executives at Banadex in Colombia.  The payments were made for the purpose of helping the AUC use the Paramilitary Terrorism Tactics in the banana-growing regions and for the purpose of benefiting and improving Chiquita's business operations in those regions.

>           **(i)    The Individual Defendants And Other High-Ranking Company Officers And Directors (i) Knew That The AUC Engaged In The Paramilitary Terrorism Tactics and (ii) Took Actions They Knew Were Providing Substantial Assistance To With The AUC's Use The Paramilitary Terrorism Tactics.**

155.    Olson learned about Chiquita's payments to left-wing guerrilla groups shortly after joining Chiquita in 1995.  By at least late 1996 or early 1997, Olson knew that the AUC was a violent terrorist organization that employed the Paramilitary Terrorist Tactics in their efforts to defeat left-wing guerrilla groups and wanted the AUC to help Chiquita against those same groups.  Olson participated in the decision to use the AUC to drive left-wing guerrilla groups out of the banana-growing regions and participated in planning and approving the decision to pay the AUC, including the decision to funnel money to the AUC through *convivirs*. Olson knew that the AUC controlled the *convivirs* to which payments were made by Chiquita and the Individual Defendants.  Olson participated in designing the methods by which the AUC would be paid and approved procedures used to surreptitiously pay the AUC directly, in cash. Olson also helped devise and approve the procedures implemented to conceal the payments to the AUC.  Olson knew that his actions were substantially assisting the AUC's use of the Paramilitary Terrorism Tactics.

156.    Kistinger was part of a group of Chiquita executives that originally approved making payments by the company to the FARC and ELN guerrillas.  Kistinger continued to approve payments to left-wing guerrilla groups well into the mid-1990s.  By at least late 1996 or early 1997, Kistinger knew that the AUC was a violent terrorist organization that employed the Paramilitary Terrorist Tactics in their efforts to defeat left-wing guerrilla groups and wanted the AUC to help Chiquita against those same groups.  Olson participated in the decision to use the AUC to drive left-wing guerrilla groups out of the banana-growing regions and participated in planning and approving the decision to pay the AUC, including the decision to funnel money to the AUC through *convivirs*.  Kistinger knew that the AUC controlled the *convivirs* to which Chiquita was making payments.  Kistinger approved both the procedures used to make payments to the AUC and also the payments made by Chiquita and the Individual Defendants to the AUC

through the *convivirs* and, later, to the AUC directly, in cash.  Kistinger also reviewed and approved the procedures implemented to conceal the payments to the AUC.  Kistinger knew that his actions were substantially assisting the AUC's use of the Paramilitary Terrorism Tactics.

157.    Tsacalis knew about, approved, and helped conceal Chiquita's payments to left-wing guerrilla groups.  By at least late 1996 or early 1997, Tsacalis knew that the AUC was a violent terrorist organization that employed the Paramilitary Terrorist Tactics in their efforts to defeat left-wing guerrilla groups and wanted the AUC to help Chiquita against those same groups.  Tsacalis participated in the decision to use the AUC to drive left-wing guerrilla groups out of the banana-growing regions and participated in planning and approving the decision to pay the AUC, including the decision to funnel money to the AUC through *convivirs*.  Tsacalis participated in designing the methods by which the AUC would be paid and approving payments by Chiquita and the Individual Defendants to the AUC through the *convivirs*, and, later, surreptitiously to the AUC directly, in cash.  Tsacalis helped design and approved the procedures implemented to conceal the payments to the AUC.  Tsacalis knew that his actions were substantially assisting the AUC's use of the Paramilitary Terrorism Tactics.

158.    Keiser was Chiquita's representative to the AUC and worked with the AUC to implement Chiquita's and the Individual Defendants' plan to provide the AUC with substantial assistance.  Keiser knew that the AUC was a violent terrorist organization that employed the Paramilitary Terrorist Tactics in their efforts to defeat left-wing guerrilla groups and wanted the AUC to help Chiquita against those same groups.  Keiser participated in the decision to use the AUC to drive left-wing guerrilla groups out of the banana-growing regions.  Among other things, Keiser personally met with the leaders of the AUC and participated in planning and coordinating the system of using *convivirs* to hide the payments made by Chiquita and the Individual Defendants.  Keiser also participated in making cash payments directly to the AUC.  Keiser also

helped design, coordinate, and implement procedures and plans to conceal the payments to the AUC.  Keiser knew that his actions were substantially assisting the AUC's use of the Paramilitary Terrorism Tactics.

159.     Warshaw knew about and approved Chiquita's payments to left-wing guerrilla groups.  By at least late 1996 or early 1997, Warshaw knew that the AUC was a violent terrorist organization that employed the Paramilitary Terrorist Tactics in their efforts to defeat left-wing guerrilla groups and wanted the AUC to help Chiquita against those same groups.  Warshaw participated in the decision to pay the AUC through *convivirs*.  Warshaw knew that the AUC controlled the *convivirs* to which the payments were made.  Warshaw approved the payments made by Chiquita and the Individual Defendants to the AUC through the *convivirs* and, later, to the AUC directly, in cash.  Warshaw also approved the procedures implemented to conceal the payments to the AUC.  Warshaw knew that his actions were substantially assisting the AUC's use of the Paramilitary Terrorism Tactics.

160.     Lindner knew about and approved Chiquita's payments to left-wing guerrilla groups.  By at least late 1996 or early 1997, Lindner knew that the AUC was a violent terrorist organization that employed the Paramilitary Terrorist Tactics in their efforts to defeat left-wing guerrilla groups and wanted the AUC to help Chiquita against those same groups.  Lindner knew about and approved the decision to pay the AUC through *convivirs*.  Lindner knew that the AUC controlled the *convivirs* to which the payments were made.  Lindner approved the payments made by Chiquita and the Individual Defendants to the AUC through the *convivirs* and, later, to the AUC directly, in cash.  Lindner also approved the procedures implemented to conceal the payments to the AUC.  Given Lindner's controlling role in the company and his stock ownership interests with his father, the payments to the AUC could not have been made or continued

without his approval.  Lindner knew that his actions were substantially assisting the AUC's use of the Paramilitary Terrorism Tactics.

161.    Ordman was the senior Chiquita executive who had operational responsibility for all of Chiquita's activities in Colombia and provided the organizational link between Chiquita's United States and Colombia operations reporting to Kistinger.  Ordman had extensive conversations with Chiquita personnel in Colombia, including Keiser who reported to him, about the different violent groups Chiquita was paying.  Ordman knew that Keiser was  Chiquita's representative to the AUC and worked with the AUC to implement Chiquita's and the Individual Defendants' plan to provide the AUC with substantial assistance.  Ordman knew that the AUC was a violent terrorist organization that employed the Paramilitary Terrorist Tactics in their efforts to defeat left-wing guerrilla groups and wanted the AUC to help Chiquita against those same groups and that the AUC had been designated as an FTO .  Ordman participated in the decision to use the AUC to drive left-wing guerrilla groups out of the banana-growing regions.  Among other things, Ordman was aware that Keiser had met with the leaders of the AUC and Ordman participated in planning and coordinating the system of using *convivirs* to hide the payments made by Chiquita and the Individual Defendants since at least 1996.  Ordman also participated in making and approving cash payments directly to the AUC and through convivir.  Ordman also helped design, coordinate, and implement procedures and plans to conceal the payments to the AUC.  Ordman knew that his actions were substantially assisting the AUC's use of the Paramilitary Terrorism Tactics.

162.    On or about May 7, 1997, Olson, Kistinger, Tsacalis, and other Chiquita executives, met in Cincinnati to discuss the amount of payments company had made to leftist guerrillas from 1993 through the end of 1996 and to budget the amount Chiquita and the Individual Defendants planned to pay the AUC during 1997.  Olson, Kistinger, Tsacalis, and the

other Chiquita executives also devised procedures for approving, making, and concealing the budgeted payments to both the leftist guerrillas and the AUC.

163.    On or about September 10, 1997, Olson, Tsacalis, Warshaw and other Chiquita executives met in Cincinnati, Ohio with the Audit Committee of the Board of Directors, each member of which was also a member of the Board of Directors of Chiquita.  Olson, Tsacalis, Warshaw, and the other Chiquita executives disclosed their provision of substantial assistance to the AUC in the Urabá region and explained that the assistance would be provided through the *convivir* controlled by the AUC.  The Audit Committee approved the provision of substantial assistance to the AUC and agreed to monitor the continued payments.

164.    On March 4 and 5, 1998, Olson, Warshaw, Tsacalis, and other Chiquita executives met with the Audit Committee at Chiquita's Cincinnati headquarters to further review the nature and extent of the substantial assistance being provided to the AUC by Chiquita and the Individual Defendants.  At the meeting, the Audit Committee agreed to continue providing substantial assistance to the AUC in Urabá should continue.

165.    In 1999, the AUC informed Keiser and Chiquita that it had recently moved into the Santa Marta banana-growing region and that it intended to drive all leftist guerrillas from the area just as they had done in the Urabá region.  To support their effort to drive the leftist guerrillas from the region, the AUC asked Chiquita to expand its assistance to the Santa Marta region.  The AUC further informed Chiquita and Keiser that it has created a convivir to collect the payments.

166.    Keiser informed the Individual Defendants that the AUC was moving into the Santa Marta banana-growing region and that the AUC was offering to drive all leftist guerillas from the region.  Accordingly, Chiquita and the Individual Defendants decided to use the AUC against the leftist guerillas in the region just as they had been doing in the Urabá region.

46

Chiquita and the Individual Defendants began making payments to the AUC in the Santa Marta region beginning in October 1999.

167.    Chiquita and the Individual Defendants knew payments made to the *convivir* in Santa Marta were substantially assisting the AUC's effort to drive leftist guerrillas out of the Santa Marta banana-growing region using the Paramilitary Terrorism Tactics.

168.    On March 10, 2000, Olson, Tsacalis, and other Chiquita executives met with the Audit Committee to review and approve the continued assistance being provided to the AUC through convivir in both the Urabá and Santa Marta banana-growing regions.  Olson, Tsacalis, and the Audit Committee members noted reviewed and approved the amounts being paid to the AUC and the expansion of the assistance into the Santa Marta region.  The Audit Committee approved the continued provision of substantial assistance to the AUC by Chiquita and the Individual Defendants.

169.    In or about September 2000, Chiquita's senior executives, including the Individual Defendants, discussed the company's payments to the AUC and the fact that the AUC was a violent paramilitary organization led by Carlos Castaño.  An in-house attorney for Chiquita conducted an internal investigation into the payments and provided a high-ranking officer of the company with a memorandum detailing the results of that investigation.  The memorandum made clear that the *convivir* were merely fronts for the AUC, which the memorandum described as a "widely-known, illegal vigilante organization."

170.    On September 12 and 13, 2000, Olson, Tsacalis, and other high-ranking Chiquita executives, including another member of the Board of Directors, met with the Audit Committee in Cincinnati, Ohio.  The Audit Committee again reviewed the nature and extent of payments being made to the AUC in both the Urabá and the Santa Marta banana-growing regions.  The Audit Committee also discussed an internal report prepared by one of Chiquita's in-house

47

counsel reiterating that the *convivir* were fronts for the AUC and that the AUC was a "widely-known, illegal vigilante organization."  According to the notes of the meeting, one of the directors responded to the presentation by asking: "Can we reduce [the] amount per box?"  There was no recorded discussion about whether to stop the payments or whether to report the payments to any United States or Colombian authorities.   Instead, Chiquita and the Individual Defendants continued to pay the AUC.

> ### (ii)   Chiquita Continued To Assist The AUC Even After The United States Government Designation Made The Payments A Felony.

171.    The United States government designated the AUC as an FTO on September 10, 2001.  That designation was well publicized in the American public media.  The AUC's designation was first reported in the national press by the Wall Street Journal and New York Times, among others, on September 11, 2001.  It was later reported in the local press in Cincinnati, Ohio where Chiquita's headquarters were located.  The Cincinnati Post reported the AUC's FTO designation on October 6, 2001, and the Cincinnati Enquirer reported the designation on October 17, 2001.  The AUC's designation was even more widely reported in public media in Colombia, where Chiquita actively conducted its banana growing operations.

172.    Chiquita and the Individual Defendants had information about the AUC'S designation as an FTO specifically and global security threats generally through an Internet-based, password-protected subscription service that it paid money to receive.  On or about September 30, 2002, a Chiquita employee, from a computer within Chiquita's Cincinnati headquarters, accessed the service's "Colombia-Update page," which contained the following reporting on the AUC.

"US terrorist designation

48

International condemnation of AUC human rights abuses culminated in 2001 with the US State Department's decision to include the paramilitaries in its annual list of foreign terrorist organizations. This designation permits the US authorities to implement a range of measures against the AUC, including denying AUC members US entry visas; freezing AUC bank accounts in the US; and barring US companies from contact with the personnel accused of AUC connections."

173. For several years, from in or about 1996 until April 2002, Chiquita and the Individual Defendants paid the AUC by check through various *convivir* in both the Santa Marta and Urabá regions. The checks were almost always made out to the *convivir* and were drawn from Banadex's bank accounts. Chiquita and the Individual Defendants concealed the true nature and purpose for the payments by recording them in its corporate books and records as "security payments" or payments for "security" or "security services."

174. After the AUC had been designated an FTO by the United States government, Olson, Tsacalis, Kistinger, Ordman and other Chiquita executives devised new procedures for paying the AUC in order to further conceal the nature and purpose of the payments. Under the new procedures, Chiquita's executives in Colombia would issue checks payable to an individual employee who would endorse the checks. After converting the check to cash, another Chiquita employee in Colombia was assigned to deliver the funds, in cash, to the AUC in Santa Marta. These procedures were reviewed and approved by other Chiquita executives, including the Individual Defendants, and were implemented by Ordman. The procedures required Ordman to review the payments every quarter and to report those payments to Kistinger.

175. On or about April 23, 2002, Olson and other high-ranking executives met with the Audit Committee in Chiquita's Cincinnati headquarters. Olson reiterated the nature and purpose of the payments the company and the Individual Defendants were making to the AUC, who the AUC was, and their use of the Paramilitary Terrorism Tactics. Olson also explained the new

procedures for paying the AUC in Santa Marta.  The Audit Committee adopted the new procedures.

176.    Beginning in or about June 2002, Chiquita and the Individual Defendants began paying the AUC in the Santa Marta region of Colombia directly, secretly, and in cash according to new procedures established by Olson, Tsacalis, Ordman and other Chiquita executives, including the Audit Committee.  The Chiquita employee to whom the AUC checks were made payable maintained a private ledger of the payments that did not reflect that the AUC was the ultimate and intended recipient of the payments.

177.    Even after learning that the United States government had formally designated the AUC as an FTO, Chiquita and the Individual Defendants continued to make payments to the AUC in the Santa Marta and Urabá regions of Colombia without applying for a required government license.  From on or about September 10, 2001, through on or about February 4, 2004, Chiquita and the Individual Defendants made 50 payments to the AUC totaling over $825,000.

> **(iii)   Chiquita Continued To Assist The AUC Against The Advice Of Its Outside Counsel In The United States.**

176.    In early 2003, the Chiquita employee through whom payments to the AUC were made in Santa Marta became concerned that the new payment method, which required him to cash large checks disguised as compensation in Colombia and then pay the AUC directly in cash, exposed him to serious risk of harm.  The employee's concerns were communicated to Olson, Kistinger, and other Chiquita executives in Cincinnati, Ohio.  Olson, Ordman and other Chiquita executives then began exploring various other options for making the payments, including the possibility of bringing cash directly into Colombia.

177.    On or about February 20, 2003, while reviewing payment options in Cincinnati, Ohio, an in-house attorney for Chiquita raised to senior officers and executives that the AUC had been designated as an FTO.  Thereafter, high-ranking officers and employees of Chiquita, including the Individual Defendants, spoke with its outside counsel in the District of Columbia office of a national law firm about the United States government's designation of the AUC as an FTO and Chiquita's ongoing payments to the AUC.

178.    Beginning on or about February 21, 2003, outside counsel advised Chiquita and Olson that the payments were illegal under United States law and that Chiquita and the Individual Defendants should immediately stop paying the AUC directly or indirectly.  Among other things, outside counsel, in words and in substance, advised Chiquita and the Individual Defendants:

- "Must stop payments."
  (notes, dated February 21, 2003)

- "Bottom Line:  CANNOT MAKE THE PAYMENT"
  "Advised NOT TO MAKE ALTERNATIVE PAYMENT through CONVIVIR"
  "General rule:  Cannot do indirectly what you cannot do directly"
  "Concluded with:  CANNOT MAKE THE PAYMENT"
  (memo, dated February 26, 2003)

- "You voluntarily put yourself in this position.  Duress defense can wear out through repetition.  Buz [business] decision to stay in harm's way.  Chiquita should leave Columbia."
  (notes, dated March 10, 2003)

- "[T]he company should not continue to make the Santa Marta payments, given the AUC's designation as a foreign terrorist organization[.]"
  (memo, dated March 11, 2003)

- "[T]he company should not make the payment."
  (memo, dated March 27, 2003)

179.    Chiquita and the Individual Defendants ignored the legal advice of its outside counsel and continued to make unlawful payments to the AUC.  In February and March 2003, Chiquita and the Individual Defendants made cash payments to the AUC totaling $36,871.

> **(iv)    Chiquita Resolved To Continue To Pay The AUC Even After Its Full Board Of Directors Learned Of The Illegality Of The Payments**.

180.    On or about April 3, 2003, Olson met with the full Board of Directors and informed them that the AUC had been designated an FTO by the United States government in September 2001.  He further advised the Board that the company's payments to the AUC were, therefore, illegal under United States law.

181.    Upon learning about the FTO designation, one director objected to the payments and recommended that Chiquita and the Individual Defendants consider taking immediate corrective action, including withdrawing from Colombia.  That recommendation was not followed.

182.    Instead, the board agreed to disclose the payments to the DOJ.  However, Chiquita's illegal payments were not disclosed to the DOJ until a full three weeks after the April 3, 2003 meeting.

183.    On or about April 4, 2003, according to the notes of Chiquita's outside counsel concerning a discussion about the AUC payments, Olson and one of Chiquita's directors were of the opinion to "just let them sue us, come after us."

184.    On or about April 8, 2003, Olson, Kistinger, and other Chiquita executives met in the United States with two Banadex employees who had flown up from Columbia seeking clear guidance about whether the payments should continue.  The meeting consisted of a discussion about the AUC, Chiquita's review of the legality of the payments, possible alternatives for making the payments, and finding ways to continue the payments.  At the conclusion of the

meeting, the Banadex employees were instructed by Olson, Kistinger, and the other Chiquita executives to continue making make payments to the AUC.

**(v)     Chiquita Continued To Pay The AUC Even After The DOJ Directed It To Cease Such Payments Immediately**.

185.    On or about April 24, 2003, Olson and one member of the Board of Directors, together with Chiquita's outside counsel, met with DOJ officials.  The DOJ officials told Olson and Chiquita's director that the company's payments to the AUC were illegal and could not continue.

186.    About two weeks after the DOJ meeting, on or about May 5, 2003, two Chiquita employees, one of whom was Ordman, traveled from Colombia to meet with Chiquita executives in Costa Rica to discuss continuing payments to the AUC.  During the meeting, the group called an in-house Chiquita attorney in Cincinnati to inquire as to whether they should continue making the payments to the AUC.  After obtaining authorization from Olson, the Chiquita attorney told the group to continue making payments to the AUC.

187.    On or about May 8, 2003, Chiquita and the Individual Defendants continued making payments to the AUC.  Thereafter, Chiquita and the Individual Defendants continued its regular payments to the AUC.

188.    Between May 12, 2003 and September 1, 2003, Chiquita and the Individual Defendants made nine cash payments totaling approximately $140,866.

189.    On or about September 8, 2003, Chiquita's outside counsel advised Chiquita and the Individual Defendants in writing that DOJ officials had repeatedly stated that they could not condone current or future payments to the AUC.

190.    Despite this warning, Chiquita and the Individual Defendants continued to make payments to the AUC.  Between September 8, 2003 and December 16, 2003, Chiquita and the Individual Defendants made six cash payments totaling approximately $126,250.

191.    On or about December 22, 2003, a member of Chiquita's board of directors warned other board members in an email that the company appeared to be "committing a felony" by continuing to make the AUC payments.

192.    Despite this warning, Chiquita and the Individual Defendants continued to make payments to the AUC.  Between December 22, 2003 and February 4, 2004, Chiquita and the Individual Defendants made three more cash payments to the AUC totaling approximately $43,023.

**D.    Chiquita Knowingly Provided Substantial Assistance To The AUC When It Facilitated The Shipment Of Narcotics Through Its Turbo Port Facilities.**

193.     Chiquita and the Individual Defendants also purposefully assisted the AUC by allowing it to use the company's private seaport facilities to smuggle large quantities of illegal drugs, especially cocaine, out of Colombia.

194.    According to Colombian prosecutors, beginning in at least 1997, the AUC shipped drugs on Chiquita's vessels carrying bananas to Europe.  On seven different occasions, the Colombian government seized cocaine hidden in banana shipments on Chiquita's ships - two of the ships on which drugs were found were named the *Chiquita Bremen* and the *Chiquita Belgie*.  More than one and one-half tons of cocaine, valued at over $33 million dollars, was found hidden in the company's produce on board various vessels.  AUC leaders have stated that the AUC also tied drugs to the hulls of banana ships at sea to evade security agencies' control points.

54

195.    Upon information and belief, drug shipments could not have been attached to Chiquita's banana boats, or hidden in the cargo, without the active collusion or willful ignorance of Chiquita employees.

196.    Chiquita and the Individual Defendants knew the AUC obtained large sums of money from its illegal drug trafficking activities.  Chiquita and the Individual Defendants also knew the AUC used the money it obtained from drug trafficking activities to finance its participation in the War, including its use of the Paramilitary Terrorism Tactics.  Chiquita and the Individual Defendants purposefully allowed the AUC to use its banana boats and ships to help the AUC acquire money that could be used to support and facilitate its effort to drive leftist guerillas out of the Santa Marta and Urabá banana-growing regions and to, thereafter, maintain control over the regions using the Paramilitary Terrorism Tactics.

197.     By providing the AUC with access to its private port at Turbo and to freighters that are owned, operated, or controlled by the company, Chiquita and the Individual Defendants had a substantial effect on the AUC's ability to carry out its plan to drive leftist guerillas out of the Santa Marta and Urabá banana-growing regions and to maintain control over the regions.

198.    As a result of the funding it derived from drug trafficking activities carried out with assistance from Chiquita and the Individual Defendants, the AUC had the resources needed to carry out the War against leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

**E.      Chiquita Knowingly Provided Substantial Assistance To The AUC When It Facilitated The Shipment Of Arms And Ammunition Through Its Turbo Port Facilities.**

199.    In addition to its financial support of the AUC, Chiquita and the Individual Defendants also facilitated the AUC's use of Paramilitary Terrorism Tactics by making its seaport facilities in the city of Turbo available to the AUC for illegal arms shipments.  Chiquita

55

and the Individual Defendants knowingly made its seaport available in order to assist the AUC in driving leftist guerillas out of the Santa Marta and Urabá banana-growing regions and maintaining control over the regions so the company's banana-growing operations could prosper.

200.    In 2001, the Nicaraguan National Police made arrangements to exchange 3,000 AK-47 assault rifles and 5 million rounds of ammunition for weapons more suited to police work.  The Nicaraguan National Police employed a private Guatemalan arms dealer to handle the exchange.  The arms dealer, in turn, arranged to sell the AK-47 assault rifles and ammunition for $575,000 to an arms merchant based in Panama acting on behalf of the AUC.

201.    In November 2001, a Panamanian-registered vessel named the "Otterloo" left Nicaragua with Panama as its declared destination carrying the assault rifles and ammunition. Instead of sailing to Panama, the Otterloo traveled to Turbo, Colombia.

202.    Bills of lading, shipping invoices, and other documents identified Chiquita as the intended recipient of the arms and ammunition shipment.

203.    The arms and ammunition were off-loaded at sea from the Otterloo onto Chiquita's barges by Chiquita's employees and brought to Chiquita's private warehouse facility where they were stored for a period of time.  Chiquita employees and/or agents supervised a fictitious inspection of the shipping containers and arranged to load the weapons and ammunition onto trucks for delivery to the AUC.

204.    A formal report by a General Secretariat of the Organization of American States concluded that the transfer of arms and ammunition to AUC could not have occurred without accomplices in Turbo.

205.    Plaintiffs are informed and believe that Chiquita, the Individual Defendants, and other high-ranking executives facilitated at least four more arms and ammunition shipments through its Turbo port facilities.  According to an interview with the Colombian newspaper *El*

*Tiempo*, Castaño boasted in response to a question about the Otterloo incident, "This is the greatest achievement by the AUC so far.  Through Central America, five shipments, 13 thousand rifles."

206.    Chiquita, the Individual Defendants, and other high-ranking executives were aware that they had substantially assisted the AUC's use of Paramilitary Terrorism Tactics by helping them acquire a large number of military-grade assault rifles together with a large quantity of ammunition for those rifles.  The arms had a substantial effect on the AUC's ability to carry out its strategy to use the Paramilitary Terrorism Tactics to drive leftist guerillas out of the Santa Marta and Urabá banana-growing regions and, thereafter, to maintain control over the regions.

207.    As a result of obtaining weapons with assistance from Chiquita and the Individual Defendants, the AUC had the resources needed to carry out the War against leftist guerillas, their sympathizers, and supporters and to maintain control over the banana-growing regions.

**F.    The Kidnapping, Torture, And Murder Of Juan Carlos Puerta.**

208.    Juan Carlos was born in Medellín, Colombia and grew up in Lowell, Massachusetts after moving there with his family at the age of seven.  He was a Colombian citizen and United States resident alien.  Juan Carlos was domiciled in Colombia at the time of his kidnapping in 1999 and death in 2001.

209.    At the age of eighteen, Juan Carlos enlisted as a private in the United States Army, where he served until his honorable discharge six years later.  Upon his honorable discharge from the armed services, Juan Carlos became a field volunteer with Peace Brigades International ("PBI"), which provided him with an opportunity to return to Colombia to do human rights work.  After living in the United States since he was seven and his six years in the United States Army, Juan Carlos spoke Spanish with an American accent.  At the time of his

57

death, Juan Carlos had not yet finalized the citizenship process to which his military service to the United States entitled him but he had become, in all outward appearance, an American.

210.    PBI is a well-known and well-respected international non-governmental human rights organization ("NGHRO") founded in 1981.  PBI's mission includes protecting human rights, promoting nonviolent transformation of conflicts and facilitating other peace-building initiatives within conflict countries.  PBI works to achieve these goals primarily by sending international volunteers to areas of conflict who then provide protective, nonviolent "accompaniment" to local human rights defenders threatened by political violence and "observe" and report on their work.  PBI is a nonpartisan organization that does not interfere with the affairs of those they accompany and observe.

211.    Juan Carlos volunteered with PBI's Emergency Response Network in Urabá.  Part of his duties involved accompanying and observing members of the Committee in Solidarity with Political Prisoners (the Fundación Comité de Solidaridad con los Presos Políticos, or the "FCSPP" ("Political Prisoners Foundation Solidarity Committee")).

212.    The FCSPP is an internationally respected Colombian NGHRO founded in 1973.  The FCSPP is dedicated to investigating prison conditions in Colombia and providing legal advice and representation, as well as other support, to Colombian political prisoners.

213.    While working with the FCSPP in his role as a PBI field volunteer, Juan Carlos worked under the direction of Evarardo De Jesus Puerta ("Evardo Puerta").  Evardo Puerta was Juan Carlos's relative and a longstanding member of the FCSPP in Antioquia, Colombia.  Juan Carlos accompanied and observed FCSPP members, including Evardo Puerta, and reported on the FCSPP's activities to PBI.

214.    During the time period relevant to this Complaint, NGHRO employees and volunteers, including Americans, working in Colombia regularly suffered serious human rights

violations at the hands of paramilitary groups, most notably the AUC, who believed them to be leftist sympathizers.

215.    For example, on or about January 28, 1999, four Colombian human rights workers affiliated with the Popular Training Institute (the Instituto Popular de Capacitación, or the "IPC") were kidnapped by the AUC in the IPC's headquarters in Medellín, Colombia. Breaking from its typical practice, the AUC publically claimed responsibility for the kidnapping and openly threatened the IPC as well as another human rights organization.

216.    Human rights workers affiliated with FCSPP were also targeted by the AUC and subjected to human rights abuses.

217.    On or about January 30, 1999, Evarardo Puerta and his FCSPP colleague Julio Gonzales were dragged from a bus traveling from Medellín to Bogota by the AUC and shot dead on the side of the street.  Witnesses at the scene testified that the two FCSPP members were singled out by their AUC attackers, as they were specifically chosen from among the many passengers traveling on the bus.

218.    That same day, on or about January 30, 1999, Juan Carlos was himself violently dragged from a bus in Urabá by the AUC.  Upon hearing Juan Carlos's American accent, the AUC, presuming him to be an American, decided against executing him on the side of the road and, instead, kidnapped him with the intention of ransoming him.

219.    Juan Carlos was then held hostage in inhumane conditions, suffering torture at the hands of his AUC kidnappers while they demanded the payment of a substantial ransom from his relatives back in the United States.  He would remain the AUC's hostage for over two years.

220.    In or about February 1999, the leader of the AUC, Carlos Castaño, personally interrogated Juan Carlos.  Castaño referred to Juan Carlos as a spy, a rat, a leftist collaborator and threat to the region, all on the basis of the reports he filed as part of his job as a human rights

59

worker.  Castaño also told Juan Carlos that the AUC had killed his relative and FSCPP

supervisor Evarardo Puerta.

      **G.**     **The Kidnapping And Torture Of Jorge Porter.**

     221.    About one month after Juan Carlos had been kidnapped by the AUC, in or about

March 1999, Juan Carlos's brother Jorge received a telephone call in the United States from

someone in Colombia who he learned was affiliated with the AUC.  The individual informed him

that Juan Carlos was being held hostage in Colombia.  Juan Carlos's AUC kidnappers demanded

a $500,000 ransom for his release and told Jorge that his brother would be killed if the ransom

was not paid.

     222.    Upon receiving this call, Jorge sought assistance from both the United States

Embassy in Colombia, the Colombian national police's El GAULA group, and Colombian police

authorities in Bogata, Colombia.  The El GAULA Group of the Colombian national police is

responsible for kidnapping cases.  All refused to provide assistance.

     223.    Following the initial telephone call in March 1999, Jorge received additional

telephone calls from individuals affiliated with the AUC in Colombia and from their co-

conspirators in the United States.  During the additional telephone calls, the AUC again

threatened to kill Juan Carlos if Jorge did not pay the $500,000 ransom and also provided

instructions for Jorge to follow when making payments toward the ransom.

     224.    In April 1999, Jorge made two payments to the kidnappers, first in the amount of

$50,000.  The second payment in the amount of $100,000.  Both payments were made to AUC

representatives that Jorge met in Florida.

     225.    Shortly after making the second payment of $100,000, Jorge was again contacted

by the AUC kidnappers from Colombia.  They informed him that they knew that he had

contacted the U.S. Embassy in Colombia and the Colombian authorities.  Stating that they no

longer trusted him, the kidnappers demanded that Jorge travel to Colombia to personally deliver the remainder of the ransom in cash. The kidnappers told Jorge that they would kill Juan Carlos unless Jorge delivered the cash himself.

226. The AUC could not have known that Jorge contacted the United States Embassy and the Colombian authorities without the active assistance of someone inside the Colombian government, its law enforcement authorities, its defense forces, or its intelligence services.

227. Before leaving Miami to travel to Colombia, Jorge made arrangements to obtain $80,000 from his grandmother who lived in Colombia.

228. As demanded by the AUC, Jorge traveled from Miami, Florida to Medellín, Colombia on or about May 11, 1999, with $20,000 in cash.

229. On or about May 11, 1999, Jorge went to a park in Medellín designated by the AUC to meet with his brother's kidnappers and, as demanded by the AUC kidnappers, took with him the $20,000 he brought from Miami and the $80,000 he obtained from his grandmother.

230. Once there, a number of men approached Jorge, forced him into a car. Inside the car, the assailants put a hood over his head, took the $100,000 in cash, and placed a gun next to him. Jorge feared for his life.

231. The kidnappers took Jorge to a house that he learned was in the Urabá region.

232. After obtaining the $100,000, the AUC kidnappers demanded that he make arrangements to pay the remaining $250,000.

233. The AUC held Jorge hostage and tortured him for approximately eight days. Among other things, the AUC kidnappers severely beat Jorge, shot him in the buttocks, sodomized him with a stick, cut various parts of his body, pulled out his fingernails, and toenails, and caused him severe emotional and mental trauma for the purpose of influencing him to do as they demanded.

234.    During the time he was held hostage, his kidnappers revealed themselves to be AUC paramilitaries.  Jorge's kidnappers called him a communist and a rat and threatened to "blow his brains out."  They also complained about Juan Carlos's human rights work in Colombia – specifically, the reports that he was sending to PBI as part of his nonpartisan accompaniment and observation work.

235.    On or about May 18, 1999, Jorge was released after being given an alarming and explicit ultimatum: return to the United States to get the rest of the ransom immediately or the AUC would sell his brother to people who would do even greater harm to him than was already being done.

236.    That same day, Jorge also telephoned the El GAULA group of the Colombian national police in both Medellin and Bogota, Colombia to seek help with the kidnapping and torture of both himself and his brother, Juan Carlos.  The national police informed Jorge that there was nothing they could do to help him.  They also advised him to return to the United States, since they could not provide him with any protection in Colombia.

237.    Jorge then telephoned the United States embassy in Bogota, Colombia seeking help.  The United States embassy staff told him that there was nothing they could do for him in Colombia, advised him to get on a plane and leave Colombia immediately, and told him to file a report with the FBI when he returned to the United States.

238.    After finishing his telephone conferences with Colombian law enforcement and the United States Embassy, one of the AUC kidnappers telephoned Jorge at the apartment where he was staying in Medellìn.  The kidnapper told Jorge that he knew that Jorge had spoken with the authorities.  The kidnapper said that he would personally kill Jorge if he did not leave Colombia immediately.

239.    The AUC could not have known that Jorge had contacted law enforcement authorities in Colombia and could not have know the telephone number of the residence where he was staying without the active assistance of someone inside Colombian government, law enforcement, its defense forces, or its intelligence services.

240.    Fearing for his life, Jorge left Colombia and returned to Miami the following morning, May 19, 2001.

241.    Upon returning to Miami, Jorge contacted the Federal Bureau of Investigation to report what had happened to Juan Carlos and to himself personally and to seek their help.  The FBI sent an agent to meet with him.  Within a few days after meeting with the FBI agent, the AUC kidnappers in Colombia telephoned Jorge in the United States to tell him that they knew he had met with the FBI in Miami.  The AUC kidnappers told Jorge to stop contacting law enforcement authorities and threatened to kill Juan Carlos if he did not stop.  They also again threatened to kill him if he did not pay the remaining $250,000 owing on the ransom demand.

242.    The AUC could not have known that Jorge had contacted the FBI in Miami without the assistance of someone in the FBI or the Colombian government, its law enforcement authorities, its defense forces, or its intelligence services.  Jorge later learned that the FBI agent he spoke with in Miami had been dealing with Colombian law enforcement officials on other matters.

243.    After the AUC kidnappers in Colombia telephoned and threatened him in Miami, Jorge contacted the United States Department of Justice to report his meeting with the FBI agent and his subsequent telephone call from the AUC.  An attorney from the Department of Justice ("DOJ") was dispatched to meet with Jorge.

244.    Within a few days after meeting with the DOJ attorney, the AUC kidnappers in Colombia again telephoned Jorge to inform him they knew he had met again with law

enforcement authorities in the United States, again demanded the remaining $250,000 ransom, and once again threatened to kill Juan Carlos if he did not stop talking to law enforcement authorities in the United States and Colombia.

245.    The AUC could not have known that Jorge had contacted the DOJ in the United States without the active assistance from someone in either the United States DOJ or the Colombian government, its law enforcement authorities, its defense forces, or its intelligence services.

246.    Terrified that every effort to seek help from law enforcement authorities was being revealed to the AUC, Jorge stopped all contacts with law enforcement in both the United States and Colombia.

247.    Over a period of approximately two years, Jorge continued to receive threatening phone calls from the AUC kidnappers in Colombia and their co-conspirators in the United States demanding the unpaid $250,000 in ransom.

248.    On or about July 8, 1999, Jorge received a phone call from his brother, who was still in captivity in Colombia.  Juan Carlos begged Jorge to come up with the rest of the ransom and told Jorge that the kidnappers were torturing him and would kill him if Jorge did not pay.

249.    From August 1999 through March 2001, the AUC continued to regularly call Jorge from both Colombia and the United States and demand the remaining ransom.  As Jorge was unable to pay the additional $250,000, calls to Jorge from the AUC kidnappers in Colombia and co-conspirators in the United States became less frequent over time.

250.    On March 8, 2001, over two years after he was first kidnapped in January 1999, the AUC murdered Juan Carlos in Colombia.

247.    The AUC was able to kidnap, torture, and murder Juan Carlos and kidnap and torture Jorge because it had taken control of every level of power in the Urabá region.  The AUC

was able to consolidate its power in Urabá because of the substantial assistance and material support it received from Chiquita and the Individual Defendants beginning in late 1996

## H.    The Consequences Of Chiquita's Criminal Conduct.

248.    On March 13, 2007, the United States filed a criminal information against Chiquita in the United States District Court for the District of Columbia.

249.    On or about March 19, 2007, Chiquita pleaded guilty to one count of Engaging in Transactions with a Specially-Designated Global Terrorist, in violation of 50 U.S.C. § 1705(b) and 31 C.F.R 594.204.  In conformity with its plea agreement, Chiquita agreed to a criminal fine of $25 million and was placed on corporate probation for a period of five years.

250.    Outside of the penal repercussions that it suffered, the financial assistance Chiquita provided to the AUC also had a substantial effect on individuals in the Santa Marta and Urabá banana-growing regions.  Chiquita's continual payments to the AUC allowed the AUC to carry out its plan to violently drive leftist guerillas out of the Santa Marta and Urabá banana-growing regions using the Paramilitary Terrorism Tactics and its ability to maintain control after regaining the regions from the leftist guerillas through "bloody pacification."

251.    Chiquita and the Individual Defendants made the payments and provided other material support to the AUC knowing that they were providing the AUC with substantial assistance for their combat against the leftist guerillas and to help them employ the Paramilitary Terrorism Tactics for which it had become notorious.

252.    As a result of the substantial assistance provided by Chiquita and the Individual Defendants, the AUC also obtained control over governmental functions in Santa Marta and Urabá.  Colombian security forces were incapable of guaranteeing public safety or preventing the leftist guerillas from returning.  The AUC, with the support of Chiquita and the Individual Defendants, assumed power over traditional government functions in those regions.

253.    Chiquita and the Individual Defendants made the payments and provided the other material support described in this Complaint to the AUC knowing that it used the Paramilitary Terrorism Tactics against individuals associated with, and working for, human rights organizations in Colombia that were viewed as being sympathetic to left-wing political causes.  Chiquita, therefore, knew that the AUC kidnapped, held hostage for extortion, tortured, maimed, and murdered human rights workers.

254.    Moreover, according to the United States Department of State, in Colombia, during time relevant to the allegations of this Complaint, all Americans were considered wealthy and were targets of kidnapping for ransom.  The State Department also warned that, as one of Colombia's three designated foreign terrorist organizations, the AUC threatened and targeted United States citizens, including Americans who worked as human rights workers.

255.    Chiquita knew that American citizens and family members of American citizens worked in Colombia and worked for human rights organizations and non-governmental organizations monitoring and reporting on the political processes in Colombia.  It, therefore, knew that American citizens and their family members were among the people targeted and injured by the AUC's Paramilitary Terrorism Tactics.

256.    Because of the substantial assistance and other material support provided by Chiquita and the Individual Defendants and its resulting control over governmental functions in the region, the AUC was able to kidnap, hold hostage for ransom, torture, and kill Juan Carlos and kidnap and torture Jorge without any fear of punishment.  Chiquita and the Individual Defendants knowingly supported the AUC's campaign to drive out leftist groups and establish the AUC's rule in these regions.  This support directly and proximately led to the kidnappings and torture of Juan Carlos and Jorge, and to Juan Carlos's murder.

I.     **Chiquita Took Sides With The AUC To Benefit From The Defeat And Expulsion Of Leftist Guerilas, Sympathizers, And Supporters In The Banana-growing Regions.**

257.    As a result of knowingly providing substantial assistance and material support to the AUC, Chiquita and the Individual Defendants received significant benefits arising from the AUC's use of the Paramilitary Terrorism Tactics to drive the leftist guerillas, and their sympathizers and supporters, out of the Santa Marta and Urabá banana-growing regions. Chiquita and the Individual Defendants received additional benefits when the AUC used the Paramilitary Terrorism Tactics to maintain control over the banana-growing regions.

258.    Because the AUC succeeded in driving the leftist guerillas out of the banana-growing regions, Chiquita executives in Colombia were no longer in constant danger of being kidnapped and held for ransom.  Chiquita's executives were no longer subject to great risk of being shot and killed by leftist guerillas.  The AUC also protected Chiquita's banana workers and property from attacks by leftist guerillas.

259.    The AUC used Paramilitary Terrorism Tactics to ensure that local people living in the banana-growing regions would never again entertain the idea of supporting or joining the leftist guerillas.

260.    By 2003, Chiquita's operations in the Santa Marta and Urabá regions were the company's most profitable banana-producing operation anywhere in the world.

J.     **Chiquita Actively And Fraudulently Concealed The Material Support It Was Providing To The AUC.**

261.    Until the United States filed the criminal information against Chiquita on March 13, 2007, Jorge had no knowledge of Chiquita's and the Individual Defendants' conduct and the violations as alleged in this Complaint.  Furthermore, until the United States filed the criminal information, Jorge could not have discovered Chiquita's and the Individual Defendants' conduct

or violations by the exercise of reasonable diligence because, among other things, Chiquita and the Individual Defendants took active steps to conceal and avoid disclosure of its payments and other forms of support to the AUC.

262.    Despite reasonable and diligent efforts, to identify all parties that might have been involved in his kidnapping and torture and the kidnapping, ransom, torture, and murder of his brother, Juan Carlos, Jorge could not have learned of Chiquita's and the Individual Defendants' funding and support for the AUC before the United States filed the Criminal Information. Indeed, even today, the full scope of Chiquita's and the Individual Defendants' conduct is unclear and requires document and testimonial discovery.

263.    Because Chiquita and the Individual Defendants knew they were providing funding and other material support to a violent terrorist organization, they acted intentionally to maintain as much secrecy as possible over the payments as well as the identity and nature of the terrorist organization they were dealing with.  For example, notes of a May 7, 1997 meeting record that the company "need[ed] to keep this very confidential – people can get killed."

264.    Chiquita and the Individual Defendants had a long history of intentionally concealing payments it has made to terrorist organizations.

265.    In fact, Chiquita's and the Individual Defendants' plan and intention to conceal their payments and other material support for the AUC was consistent with, and a continuation of, their intentional concealment of payments to the FARC and the ELN in the years preceding their decision to purposefully assist the ACU to bring about the "bloody pacification" of the banana-growing regions of Colombia.  To conceal their payments to, and other material support for, the FARC and the ELN, Chiquita and the Individual Defendants engaged in, among other things, the following conduct:

a.   Chiquita and the Individual Defendants falsified payroll records to divert funds from non-existent employees to the FARC, used existing contracts with legitimate organizations to bury and disguise payments to FARC, or created fake contracts with legitimate vendors as a means of falsifying the payments to leftist guerillas and booking them as legitimate expenses.

b.   Chiquita and the Individual Defendants concealed payments to the FARC by paying local labor unions that they knew were controlled by the FARC or by making payments through FARC-established front companies.

c.   Chiquita and the Individual Defendants further concealed their payments to the FARC by having a senior Chiquita employee personally transport and deliver large sums of cash to the FARC on a regular basis.

266.   When Chiquita and the Individual Defendants determined to provide substantial assistance and material support to the AUC, they adopted similar strategies to conceal their unlawful conduct from U.S. and Colombian authorities, and to prevent the disclose of information to the public, including Jorge, Libia, and Alexander.  Among other things, Chiquita and the Individual Defendants engaged in the following conduct:

a.   Beginning in or around 1996 and continuing through April 2002, Chiquita and the Individual Defendants concealed their payments to the AUC by issuing checks payable to various *convivir* in both the Santa Marta and Urabá regions. The checks were drawn from Banadex's bank accounts in Colombia and intended to conceal the ultimate, intended recipient of the funds.  Chiquita and the Individual Defendants further concealed their unlawful conduct by recording the payments in its corporate books and records as "security payments" or payments for "security" or "security services."

69

       b.      After learning that their payments to the AUC constituted criminal conduct, Chiquita and the Individual Defendants adopted a new scheme for more completely concealing their unlawful conduct.  These new procedures were designed, reviewed and approved by senior Chiquita personnel in the United States and in Colombia, including the Individual Defendants.  At a meeting of the Audit Committee in the United States, Chiquita and the Individual Defendants determined to conceal the AUC payments by instructing executives in Colombia to issue checks payable to an individual employee who would endorse the checks and convert them to cash.  After converting the check to cash, another Chiquita employee in Colombia was assigned to deliver the funds, in cash, to the AUC.

       c.      Beginning in or about June 2002, Chiquita and the Individual Defendants implemented their new procedures for concealing their payments to the AUC and began paying the AUC in the Santa Marta region of Colombia directly, secretly and in cash.

       d.      To further conceal the violations, the Chiquita employee to whom the AUC checks were made payable maintained a private ledger of the payments that did not reflect that the AUC was the ultimate and intended recipient of the payments.

       e.      To further conceal the ultimate and intended recipient of the cash payments, Chiquita and the Individual Defendants treated the payments as compensation to its individual employee, recorded the withholding of the corresponding Colombian tax liability, reported the payments to Colombian tax authorities as compensation to its employee, and paid its employee's corresponding tax liability.

267.     Even after making its disclosure to the Justice Department in 2003, Chiquita and the Individual Defendants continued to conceal from the public -- and from Jorge, Libia, and

Alexander -- the violations alleged in this Complaint and did not disclose to the public the information they provided to the Justice Department.

268.    On May 11, 2008, during a 60 Minutes report broadcast by CBS News, Chiquita's then Chief Executive Officer, Fernando Aguirre, admitted that Chiquita actively hid its payments to terrorists so well that if it had not admitted its conduct, no one would have been able to discover it.  Mr. Aguirre stated, "if we hadn't gone to the Justice Department, we probably would not be talking about this whole issue.  No one would know about this."

269.    The actions by Chiquita and the Individual Defendants, as alleged in this Complaint, were wrongfully and intentionally concealed by Chiquita and the Individual Defendants for the express purpose of precluding detection and disclosure.   Chiquita and the Individual Defendants carried out the unlawful conduct described herein in a manner that, in fact, prevented disclosure to, and discovery by, the public, including Jorge, Libia, and Alexander, until March 13, 2007 when the United States filed its criminal information against the company and Chiquita plead guilty.

270.    By virtue of Chiquita's and the Individual Defendants' fraudulent concealment, the statute of limitations has been tolled with respect to any claims that Jorge, Libia, and Alexander have as a result of the conduct alleged in this Complaint.

### K.    Plaintiffs' Potential Remedies In Colombia Have Either Been Exhausted Or Would Be Futile.

271.    Plaintiffs have exhausted their remedies in Colombia.

272.    Among other things, beginning shortly after Jorge's return from Colombia on May 19, 2001 to the present, Plaintiffs sought to pursue their remedies through the following government agencies, organizations, and individuals:

a.      Contacted the El GAULA unit of the Colombian national police in both Bogota and Medellin, Colombia regularly for a period of months;

b.      Contacted and reported the kidnappings and torture to other units of the Colombian national police;

c.      Contacted and reported the kidnappings and torture on multiple occasions to the Attorney General of Colombia;

d.      Met with Colombian foreign counsel in the Consulate in Miami concerning the kidnappings and torture;

e.      Met with the Attorney General for Colombia concerning the kidnapping and torture;

f.      Contacted and reported the kidnappings and torture to the United States Embassy in Colombia;

g.      Contacted and reported the kidnappings and torture to the FBI and the Department of Justice in the United States;

h.      Contacted and reported the kidnappings and torture to the FCSPP in both Canada and Colombia; and

i.      Hired an attorney in Medellin to represent them and pursue remedies on their behalf.  The attorney eventually refused to continue working on the matter after he began receiving death threats.

273.    As a result of the kidnappings, torture, murder of Juan Carlos, the kidnapping of Jorge, the Colombian government's close cooperation with the AUC, the AUC's direct threats to Jorge, and their prior experiences and efforts to seek redress and remedies, Plaintiffs fear for their safety in Colombia.  As a result, Jorge has not returned to Colombia since May, 1999.

274.    Moreover, under the circumstances of this case, Plaintiffs are not required to exhaust their remedies in Colombia because exhaustion would be futile, unobtainable, ineffective, or inadequate.

## CLAIMS FOR RELIEF

### General Allegations

275.    Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

276.    At all times relevant to this Complaint, Chiquita and the Individual Defendants knew that the AUC was a violent paramilitary organization continually engaging in terrorism, brutal crimes, and human rights violations against civilians in Colombia using the Paramilitary Terrorism Tactics.  Chiquita and the Individual Defendants also were aware that the AUC kidnapped, killed, and tortured American citizens involved in what they considered leftist related activities like to those associated with NGHROs.

277.    Chiquita and the Individual Defendants provided substantial assistance to the AUC knowing that the assistance would help the AUC accomplish the "bloody pacification" of the Santa Marta and Urabá banana-growing regions.  Chiquita and the Individual Defendants did so in order to enhance the operations and profitability of the company's Colombian banana-growing operations.

278.    The attacks on Jorge and Juan Carlos, as described herein, were part of a pattern and practice of systematic human rights violations paid for, facilitated, condoned, confirmed, aided and abetted and/or ratified by Chiquita and the Individual Defendants, and were committed in conspiracy with the AUC.

279.    As a direct and proximate result of Chiquita's and the Individual Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and

suffering, personal injuries, property damage, harm to their livelihood and extreme and severe mental anguish and emotional distress. Plaintiffs are thereby entitled to compensatory, punitive, treble damages in amounts to be proven at trial.

### FIRST CLAIM FOR RELIEF
Committing Acts of International Terrorism
in violation of 18 U.S.C. § 2333(a), 2339A, and 2332(c)
(Jorge Kidnapping and Serious Bodily Injury)

280. Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

281. Jorge is a citizen of the United States.

282. Jorge has been injured in his person, property, or business by reason of acts of international terrorism committed by Chiquita that involved violent acts or acts dangerous to human life in violation of the criminal laws of the United States, including 18 U.S.C. § 2339A, which prohibits providing material support knowing or intending that it would be used by the AUC to carry out violations of United States criminal laws, including 18 U.S.C. § 2332(c), which prohibits causing serious bodily injury to nationals of the United States, such as Jorge, while they are outside the United States.

283. The AUC's use of the Paramilitary Terrorism Tactics, including kidnapping, holding hostage for extortion, torturing, maiming and causing serious bodily injury to nationals of the United States and other persons, was intended to (i) intimidate or coerce the civilian population of Colombia and the United States; (ii) influence the policy of the governments of Colombia and the United States by intimidation or coercion; and (iii) affect the conduct of the governments of Colombia and the United States by mass destruction, murdering, kidnapping, hostage taking for extortion, torturing, and maiming.

284. The conduct of Chiquita and the AUC transcended national boundaries.

285.    The acts of terrorism set forth herein were extreme and outrageous and were done knowingly with the intention to cause extreme pain, suffering, and extreme emotional distress to the individuals who were kidnapped, held hostage for extortion, and murdered and extreme emotional distress to the family members of those individuals.

286.    At all times relevant to this Complaint, Chiquita knew that the AUC was a violent terrorist organization that used the Paramilitary Terrorism Tactics, including kidnapping, torturing, maiming, and causing serious bodily injury to American citizens such as Jorge, in violation of 18 U.S.C. § 2332(c).

287.    Chiquita violated 18 U.S.C. § 2339A by providing material support and other resources to the AUC, including the provision of funds and other material assistance as described in this Complaint, knowing, intending, or in reckless disregard that the material support would be used by the AUC in preparation for, or in carrying out, the Paramilitary Terrorism Tactics, including violations of 18 U.S.C. § 2332(c) that would cause injury to American citizens.

288.    The funds and other support provided to the AUC knowingly, intentionally, or with reckless disregard, by Chiquita provided the AUC with material support or resources for the preparation and carrying out the Paramilitary Terrorism Tactics and made it possible for the AUC to kidnap, torture, maim, and cause serious bodily injury to Jorge in violation of 18 U.S.C. § 2332(c).

289.    Chiquita's violation of 18 U.S.C. § 2339A constitutes an act of international terrorism in violation of 18 U.S.C. § 2333(a).

290.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused injuries to Jorge in his person, property, or business, Chiquita is liable pursuant to 18 U.S.C. § 2333(a) for treble the damages Jorge has sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF
Committing Acts of International Terrorism
in violation of 18 U.S.C. § 2333(a), 2339A, and 2340A
(Jorge Kidnapping and Torture)

291.    Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

292.    Jorge is a citizen of the United States.

293.    Jorge has been injured in his person, property, or business by reason of acts of international terrorism committed by Chiquita that involved violent acts or acts dangerous to human life in violation of the criminal laws of the United States, including 18 U.S.C. § 2339A, which prohibits providing material support knowing or intending that it would be used by the AUC to carry out violations of United States criminal laws, including 18 U.S.C. § 2340A, which prohibits torturing individuals, such as Jorge, outside the United States.

294.    The AUC's use of the Paramilitary Terrorism Tactics, including kidnapping, torturing, maiming and causing serious bodily injury was intended to (i) intimidate or coerce the civilian population of Colombia and the United States; (ii) influence the policy of the governments of Colombia and the United States by intimidation or coercion; and (iii) affect the conduct of the governments of Colombia and the United States by mass destruction, murdering, kidnapping, hostage taking for extortion, torturing, and maiming.

295.    The conduct of Chiquita and the AUC transcended national boundaries.

296.    The acts of terrorism set forth herein were extreme and outrageous and were done knowingly with the intention to cause extreme pain, suffering, and extreme emotional distress to the individuals who were kidnapped, held hostage for extortion, and murdered and extreme emotional distress to the family members of those individuals.

297.    At all times relevant to this Complaint, Chiquita knew that the AUC was a violent terrorist organization that used the Paramilitary Terrorism Tactics, including kidnapping, torturing, maiming, and causing serious bodily injury in violation of 18 U.S.C. § 2340A.

298.    Chiquita violated 18 U.S.C. § 2339A by providing material support and other resources to the AUC, including the provision of funds and other material assistance as described in this Complaint, knowing, intending, or in reckless disregard that the material support would be used by the AUC in preparation for, or in carrying out, the Paramilitary Terrorism Tactics, including violations of 18 U.S.C. § 2340A that would cause injury to American citizens.

299.    The funds and other support provided to the AUC knowingly, intentionally, or with reckless disregard, by Chiquita provided the AUC with material support or resources for the preparation and carrying out the Paramilitary Terrorism Tactics and made it possible for the AUC to kidnap, torture, maim, and cause serious bodily injury to Jorge in violation of 18 U.S.C. § 2340A.

300.    Chiquita's violation of 18 U.S.C. § 2339A constitutes an act of international terrorism in violation of 18 U.S.C. § 2333(a).

301.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused injuries to Jorge in his person, property, or business, Chiquita is liable pursuant to 18 U.S.C. § 2333(a) for treble the damages Jorge has sustained as a result of such injuries.

**THIRD CLAIM FOR RELIEF**
Committing Acts of International Terrorism
in violation of 18 U.S.C. § 2333(a), 2339A, and 2332b
(Jorge Kidnapping and Threat to Kill)

302.    Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

303.    Jorge is a citizen of the United States.

304.    Jorge has been injured in his person, property, or business by reason of acts of international terrorism committed by Chiquita that involved violent acts or acts dangerous to human life in violation of the criminal laws of the United States, including 18 U.S.C. § 2339A, which prohibits providing material support knowing or intending that it would be used by the AUC to carry out violations of United States criminal laws, including 18 U.S.C. § 2332b, which prohibits threating to kill, maim, or assault and cause serious bodily injury to any person in the United States, such as Jorge, by way of conduct that transcends national boundaries.

305.    The AUC's use of the Paramilitary Terrorism Tactics, including kidnapping, torturing, maiming and causing serious bodily injury was intended to (i) intimidate or coerce the civilian population of Colombia and the United States; (ii) influence the policy of the governments of Colombia and the United States by intimidation or coercion; and (iii) affect the conduct of the governments of Colombia and the United States by mass destruction, murdering, kidnapping, hostage taking, torturing, and maiming.

306.    The conduct of Chiquita and the AUC transcended national boundaries.

307.    The acts of terrorism set forth herein were extreme and outrageous and were done knowingly with the intention to cause extreme pain, suffering, and extreme emotional distress to the individuals who were kidnapped, held hostage and murdered and extreme emotional distress to the family members of those individuals.

308.    At all times relevant to this Complaint, Chiquita knew that the AUC was a violent terrorist organization that used the Paramilitary Terrorism Tactics, including kidnapping, holding hostage for extortion, torturing, maiming, and causing serious bodily injury in violation of 18 U.S.C. § 2340A.

309.    Chiquita violated 18 U.S.C. § 2339A by providing material support and other resources to the AUC, including the provision of funds and other material assistance as described

in this Complaint, knowing, intending, or in reckless disregard that the material support would be used by the AUC in preparation for, or in carrying out, the Paramilitary Terrorism Tactics, including violations of 18 U.S.C. § 2332b that would cause injury to American citizens.

310.    The funds and other support provided to the AUC knowingly, intentionally, or with reckless disregard, by Chiquita provided the AUC with material support or resources for the preparation and carrying out the Paramilitary Terrorism Tactics and made it possible for the AUC to threaten to kill, maim, and assault and cause serious bodily injury to Jorge in violation of 18 U.S.C. § 2332b.

311.    Chiquita's violation of 18 U.S.C. § 2339A constitutes an act of international terrorism in violation of 18 U.S.C. § 2333(a).

312.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused injuries to Jorge in his person, property, or business, Chiquita is liable pursuant to 18 U.S.C. § 2333(a) for treble the damages Jorge has sustained as a result of such injuries.

## FOURTH CLAIM FOR RELIEF
### Committing Acts of International Terrorism
### in violation of 18 U.S.C. § 2333(a), 2339A, and 2340A
### (Juan Carlos Hostage Taking, Torture, and Murder)

313.    Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

314.    Plaintiffs are American citizens and the direct family members of Juan Carlos, who was kidnapped, held hostage, tortured and murdered by the AUC.

315.    Plaintiffs have been injured in their person, property, or business by reason of acts of international terrorism committed by Chiquita that involved violent acts or acts dangerous to human life in violation of the criminal laws of the United States, including 18 U.S.C. § 2339A, which prohibits providing material support knowing or intending that it would be used to carry

out violations of United States criminal laws, including 18 U.S.C. § 2340A, which prohibits torturing individuals, such as Juan Carlos, outside the United States.

316.     The AUC's use of the Paramilitary Terrorism Tactics, including the kidnappings, hostage taking for extortion, torturing, maiming, and causing serious bodily injury was intended to (i) intimidate or coerce the civilian population of Colombia; (ii) influence the policy of the governments of Colombia and the United States by intimidation or coercion; and (iii) affect the conduct of the governments of Colombia and the United States by mass destruction, assassination, kidnapping, or hostage taking for extortion.

317.     The conduct of Chiquita and the AUC transcended national boundaries.

318.     The acts of terrorism set forth herein were extreme and outrageous and were done knowingly with the intention to cause extreme pain and suffering to the individuals who were kidnapped, held hostage and murdered and extreme emotional distress to the family members of those individuals.

319.     At all times relevant to this Complaint, Chiquita knew that the AUC was a violent terrorist organization that used the Paramilitary Terrorism Tactics, including kidnapping, hostage taking for extortion, torturing, maiming, and murdering individuals such as Juan Carlos, in violation of 18 U.S.C. § 2340A.

320.     Chiquita violated 18 U.S.C. § 2339A by providing material support and other resources to the AUC, including the provision of funds and other material assistance as described in this Complaint, knowing, intending, or in reckless disregard that the material support would be used by the AUC in preparation for, or in carrying out, the Paramilitary Terrorism Tactics, including violations of 18 U.S.C. § 2340A that would cause injury to American citizens.

321.     The funds and other material support provided to the AUC knowingly, intentionally, or with reckless regard by Chiquita provided the AUC with material support or

resources for the preparation and carrying out of the Paramilitary Terrorism Tactics and made it possible for the AUC to kidnap, hold hostage for extortion, torture, and murder Juan Carlos in violation of 18 U.S.C. § 2340A.

322.     Chiquita's violation of 18 U.S.C. § 2339A constitutes an act of international terrorism in violation of 18 U.S.C. § 2333(a).

323.     By participating in the commission of violations of 18 U.S.C. § 2339A that have caused injuries to Plaintiffs in their person, property, or business, Chiquita is liable pursuant to 18 U.S.C. § 2333(a) for treble the damages Jorge, Libia, and Alexander have sustained as a result of such injuries.

**FIFTH CLAIM FOR RELIEF**
Committing Acts of International Terrorism
in violation of 18 U.S.C. § 2333(a), 2339A, and 1203
(Juan Carlos Hostage Taking and Murder)

324.     Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

325.     Plaintiffs are American citizens and the direct family members of Juan Carlos, who was kidnapped, held hostage for ransom, tortured and murdered by the AUC.

326.     Plaintiffs have been injured in their person, property, or business by reason of acts of international terrorism committed by Chiquita that involved violent acts or acts dangerous to human life in violation of the criminal laws of the United States, including 18 U.S.C. § 2339A, which prohibits providing material support knowing or intending that it would be used to carry

out violations of United States criminal laws, including 18 U.S.C. § 1203, which prohibits taking

individuals, such as Juan Carlos, hostage in order to compel a third person to pay a ransom.

327.    The AUC's use of the Paramilitary Terrorism Tactics, including the kidnappings,

hostage taking, torturing, maiming, and causing serious bodily injury was intended to (i)

intimidate or coerce the civilian population of Colombia; (ii) influence the policy of the

governments of Colombia and the United States by intimidation or coercion; and (iii) affect the

conduct of the governments of Colombia and the United States by mass destruction,

assassination or kidnapping.

328.    The conduct of Chiquita and the AUC transcended national boundaries.

329.    The acts of terrorism set forth herein were extreme and outrageous and were done

knowingly with the intention to cause extreme pain and suffering to the individuals who were

kidnapped, held hostage for extortion, and murdered and extreme emotional distress to the

family members of those individuals.

330.    At all times relevant to this Complaint, Chiquita knew that the AUC was a violent

terrorist organization that used the Paramilitary Terrorism Tactics, including kidnapping, hostage

taking for extortion, torturing, maiming, and murdering individuals such as Juan Carlos, in

violation of 18 U.S.C. § 1203.

331.    Chiquita violated 18 U.S.C. § 2339A by providing material support and other

resources to the AUC, including the provision of funds and other material assistance as described

in this Complaint, knowing, intending, or in reckless disregard that the material support would be

used by the AUC in preparation for, or in carrying out, the Paramilitary Terrorism Tactics,

including violations of 18 U.S.C. § 1203 that would cause injury to American citizens.

332.    The funds and other material support provided to the AUC knowingly,

intentionally, or with reckless regard by Chiquita provided the AUC with material support or

resources for the preparation and carrying out of the Paramilitary Terrorism Tactics and made it possible for the AUC to kidnap, hold hostage for extortion, torture, and murder Juan Carlos in violation of 18 U.S.C. § 1203.

333.    Chiquita's violation of 18 U.S.C. § 2339A constitutes an act of international terrorism in violation of 18 U.S.C. § 2333(a).

334.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused injuries to Plaintiffs in their person, property, or business, Chiquita is liable pursuant to 18 U.S.C. § 2333(a) for treble the damages Jorge, Libia, and Alexander have sustained as a result of such injuries.

**SIXTH CLAIM FOR RELIEF**
(Torture In Violation Of The Torture Victims Protection Act)
(Jorge Kidnapping and Torture)

314.     Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

315.    Torture is a violation of the Torture Victims Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350, note.

316.    The AUC's treatment of Jorge constituted torture in that the AUC intentionally inflicted severe pain or suffering, physically and mentally, on Jorge in order to obtain information, obtain a confession, intimidate or coerce Jorge or his family, or a third person, or to punish Jorge or a third person.

317.    When the AUC tortured Jorge, the AUC was acting under the color of law of Colombia.

318.    The Individual Defendants knew the AUC engaged in torture as a part of a strategy to defeat leftist guerillas and to maintain control over areas it regained.

319.    The Individual Defendants aided and abetted the AUC's torture, in violation of the Torture Victims Protection Act, by, among other things, knowingly and intentionally causing Chiquita to (i) make over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii) allow its ships and seaport facilities to be used by the AUC to ship narcotics throughout the world; and (iii) allow its seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms.

320.    The Individual Defendants acted knowing that the substantial assistance they provide would enable the AUC to engage in torture during the War against leftist guerillas, their sympathizers, and supporters and to maintain control over, and bring about the "bloody pacification" of, the banana-growing regions.

321.    The substantial assistance and material support that the Individual Defendants knowingly caused Chiquita to provide to the AUC substantially assisted the AUC in engaging in the torture of Jorge.

322.    The agreement the Individual Defendants and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

323.    As a proximate result of the conduct of the Individual Defendants, Jorge has suffered serious physical and mental injuries.  Among other things, the AUC pulled our Jorge's toenails.

324.    Jorge pursued and exhausted all remedies available to him in Colombia to no avail.  Given the close cooperation between Colombian law enforcement and government officials and the AUC, Jorge fears for his safety in Colombia.  Consequently, Jorge has not returned to Colombia since the AUC freed him in May 1999.

325.     As a result of the Individual Defendants aiding and abetting the AUC's torture in violation of the Torture Victims Protection Act, Jorge is entitled to compensatory and punitive damages in an amount to be proven at trial.

### SEVENTH CLAIM FOR RELIEF
(Torture In Violation Of The Torture Victims Protection Act)
(Juan Carlos Kidnapping, Torture, and Murder)

326.     Plaintiffs repeat and reallege the allegations in each of the preceding paragraphs as if fully set forth herein.

327.     Torture and extrajudicial killings are violations of the Torture Victims Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (1992), codified at 28 U.S.C. § 1350, note.

328.     The AUC's treatment of Juan Carlos constituted torture in that the AUC intentionally inflicted severe pain or suffering, physically and mentally, on Juan Carlos in order to obtain information, obtain a confession, intimidate or coerce Jorge or his family, or a third person, or to punish Juan Carlos or a third person.  The AUC's killing of Juan Carlos constituted an extrajudicial killing because it was not accompanied by due process or any judicial proceeding to establish a capital offense under the laws of Colombia.

329.     When the AUC tortured and killed Juan Carlos, it was acting under the color of law of Colombia.

330.     The Individual Defendants knew the AUC engaged in torture and extrajudicial killing as a part of a strategy to defeat leftist guerillas and to maintain control over areas it regained.

331.     The Individual Defendants aided and abetted the AUC's torture, in violation of the Torture Victims Protection Act, by, among other things, knowingly and intentionally causing Chiquita to (i)  make over one hundred payments totaling more than $1.7 million to the AUC between 1996 and 2004; (ii)  allow its ships and seaport facilities to be used by the AUC to ship

85

narcotics throughout the world; and (iii) allow its seaport facilities to be used by the AUC to unlawfully receive shipments of military-grade firearms.

332.    The Individual Defendants acted knowing that the substantial assistance they provide would enable the AUC to engage in torture during the War against leftist guerillas, their sympathizers, and supporters and to maintain control over, and bring about the "bloody pacification" of, the banana-growing regions.

333.    The financial and other support that the Individual Defendants knowingly caused Chiquita to provide to the AUC substantially assisted the AUC in engaging in the torture and extrajudicial killing of Juan Carlos.

334.    The agreement the Individual Defendants, through Chiquita, and the AUC constituted a criminal relationship to bring about the bloody pacification of the banana-growing regions.

335.    As a proximate result of the conduct of the Individual Defendants, Plaintiffs have suffered damages resulting from the wrongful death of Juan Carlos.

336.    Plaintiffs pursued and exhausted all remedies available to them in Colombia to no avail.  In particular, given the close cooperation between Colombian law enforcement and government officials and the AUC, Plaintiffs fear for their safety in Colombia.

337.    As a result of the Individual Defendants aiding and abetting the AUC's torture and extrajudicial killing of Juan Carlos in violation of the Torture Victims Protection Act, the Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs may pray that this Court:

(a)     enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)     enter an Order declaring that Chiquita has violated the Antiterrorism Act, 18

U.S.C. § 2333 *et seq*. and that the Individual Defendants have violated the Torture Victim

Protection Act, 28 U.S.C. § 1350, note;

(c)     award Plaintiffs compensatory and punitive damages in amounts to be determined

at trial;

(d)     award Plaintiffs treble damages against Chiquita pursuant to 18 U.S.C. § 2333(a);

(e)     award Plaintiffs any and all costs sustained in connection with the prosecution of

this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333(a); and

(f)     award Plaintiff such other and further relief as the Court deem just under the

circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiffs demand trial by jury in

this action of all issues so triable.


Dated: March 10, 2017

                              STRAUSS TROY


                              /s/ Ronald R. Parry_____
                              Ronald R. Parry (0038027)
                              The Federal Reserve Building
                              150 East Fourth Street
                              Cincinnati, OH 45202-4018
                              Phone: (513) 621-2120
                              Fax: (513) 241-8259
                              Email: rrparry@strausstroy.com

87

Douglass A. Mitchell
*Pro Hac Vice to be filed*
BOIES, SCHILLER & FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, Nevada 89101
Phone: (702) 382-7300
Fax: (702) 382-2755
Email: dmitchell@bsfllp.com

Jonathan W. Davenport
*Pro Hac Vice to be filed*
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
jdavenport@bsfllp.com

*Attorneys for Plaintiffs*